**James T. GRIGSBY, Petitioner,**

v.

**James MABRY, Commissioner, Arkansas Department of Correction, Respondent.**

**No. PB-C-78-32.**

United States District Court,
E. D. Arkansas,
Pine Bluff Division.

Jan. 28, 1980.

Motion To Reconsider and Amend Judgment Granted March 7, 1980.

---

**57.** Unless an establishment such as a factory were to be constructed on Parcel 76.

William R. Wilson, Jr. and Thomas M. Carpenter, Little Rock, Ark., for petitioner.

Ray E. Hartenstein, Darrell F. Brown, Asst. Attys. Gen., State of Ark., Little Rock, Ark., for respondent.

## MEMORANDUM AND ORDER

EISELE, Chief Judge.

James Grigsby filed a petition for writ of habeas corpus on March 15, 1978, setting forth seven different grounds challenging the validity of his state court conviction.[1] On March 7, 1979, relief on the first six grounds was denied, judgment on the seventh ground was reserved, counsel was appointed for the defendant and the attorneys for both parties were directed to brief the issues. An evidentiary hearing was scheduled for, and held on, May 16, 1979, to determine whether the state trial court abused its discretion when it refused a continuance sought by Grigsby for the purpose of developing evidence to show that a "death qualified" jury is a guilt prone jury and is also not a representative jury and thus denies to the defendant due process and his Sixth Amendment right to an impartial and properly constituted jury.[2] The Court then took the case under advisement.

Grigsby, who is in custody in the Arkansas Department of Correction, was convicted in Franklin County of capital felony murder, a crime which is punishable by death or life imprisonment. Four days before the state court trial, his appointed counsel filed several motions, including one

---

1. James Grigsby was charged with the crime of capital felony murder in that on July 18, 1975, he allegedly shot and killed John Henry Childers while perpetrating the crime of robbery. According to Grigsby's statement, he and Childers had been drinking and riding around in Childers' car. Grigsby showed Childers a stolen .25 caliber automatic pistol, with which Childers was accidentally shot. Grigsby then removed $25 from Childers as an afterthought, left him at the edge of the road in some bushes, and drove away in his car. The State maintained that the shooting was deliberate, a part of a continuous series of events motivated by robbery, and done in perpetration of the robbery.

The jury found, based on circumstantial evidence, that Childers was killed in the perpetration of a robbery. They apparently did not come to this decision easily, judging from the sequence of events after the jury began its deliberations. Beginning at 10:56 a. m. when the jury retired, that sequence included:

| | |
|---|---|
| 10:56 a.m. | Jury retired |
| 10:30 | Jury returned |
| 11:33 | Jury retired |
| 12:00–1:26 p.m. | Noon recess |
| 3:15 | Jury returned for question and retired |
| 4:20 | Jury returned without verdict |
| 4:25 | Jury retired |
| 6:30 | Jury returned |
| 7:31 | Jury retired |
| 9:15 | Jury returned |
| 9:17 | Jury retired |
| 9:45 | Jury returned and claimed deadlock |
| 9:55 | Jury retired |
| 10:55 | Jury returned with verdict |

2. The problem arises because, under Arkansas practice, the same jury that passes upon a defendant's guilt must also, in a separate later proceeding (if the verdict is "guilty") make a decision as to the appropriate punishment. In a capital case, therefore, if the State does not waive the death penalty, the State insists on the right to *voir dire* the members of the jury panel on their attitude toward the death penalty and to exclude those who are irrevocably opposed to the death penalty *because,* if the jury finds guilt, it will then be called upon to fix the penalty which may include death. If Arkansas followed the federal practice in which the judge fixes the sentence after a jury verdict of guilt, or, if Arkansas required a separate "sentencing" jury, the problem would not arise because it would obviously be improper to excuse a juror *for cause* (in the guilt-determination trial) solely upon the basis of his irrevocable opposition to the death penalty. *But see Spinkellink v. Wainwright,* 578 F.2d 582 (5th Cir. 1978) which suggests to the contrary.

asking for a ruling that potential jurors opposed to capital punishment *not* be excluded *for cause* during the guilt-determination phase of the trial; a motion for payment of witness fees; and a motion for continuance so that the evidence to support defendant's allegation that a death qualified jury is guilt prone could be developed. Counsel proposed in the last motion to bring Dr. F. J. Goldberg and Dr. Daniel Taub to support the defendant's position. On September 15, 1975, these motions were denied, the Court stating that Franklin County was not obligated to pay the witnesses' expenses.

Trial began on September 19, 1976. Thirty-eight potential jurors were examined on voir dire.[3] Nine were excused for cause by the Court—three on *Witherspoon* grounds.[4] Eight were challenged by the State and seven by the defense. The jury returned a guilty verdict (after over 12 hours of deliberations during which they returned to ask questions and on one occasion to report "deadlocked"). Thereupon the State waived the death penalty. Grigsby was sentenced to life in prison without parole.

On appeal, the conviction and sentence were affirmed by the Supreme Court of Arkansas. Although there the petitioner did raise the issue now before this Court, the Arkansas Supreme Court dealt with it in one line, relying upon its prior decision in *Venable v. State,* 260 Ark. 201, 538 S.W.2d 286 (1976). Grigsby then sought post-conviction relief pursuant to Rule 37; an evidentiary hearing was held; and the Franklin Circuit Court denied the motion. He has thus exhausted his state remedies.

The question first presented here is whether the state trial court, if it had granted the continuance and held the requested hearing, must have, or could have, on the basis of the evidence then available, found that a death qualified jury is not representative, or is not impartial, as guaranteed by the Sixth and Fourteenth Amendments. If the answer is in the affirmative on either issue, additional questions arise.

## I.

 The Sixth Amendment guarantees, made applicable to the states in *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), include the right to be tried by a jury drawn from all segments of the community,[5] in order to serve the historic jury function, as stated in *Witherspoon v. Illinois,* 391 U.S. 510, 519, 88 S.Ct.

---

**3.** In an Arkansas felony trial, the defense has 12 peremptory challenges and the State has 10. Thirteen jurors were selected; the alternate did serve when one of the first 12 jurors became ill. So if the Court had refused to excuse for cause based on *Witherspoon,* the jury which tried Grigsby could not have been the same even had the State used its two remaining peremptories to excuse such potential jurors.

Voir dire examination of James H. Weseman, Tr. 128:

"Q. Am I correct in saying that it is your position that if you are selected as a juror, regardless of what the law is, giving you alternatives, you could not return a verdict of the death penalty. Is that right?
"A. That's correct."

Voir dire examination of Eules Grant Walker, Tr. 218:

"Q. . . . Is there any circumstance under which you would be willing to consider imposing the death penalty?

"A. I don't feel like I would."
Voir dire examination of Barbara Bearden, Tr. 253:

"Q. . . . Is there any set of circumstances, any fact situation in which you feel you could vote for the death penalty?
"A. I don't think so.
"Q. Under no circumstances at all that you could? There is not a fact situation that could be presented to you where you could vote for the death penalty?
"A. No."

**4.** *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

**5.** "A criminal defendant has standing to challenge exclusion resulting in a violation of the fair-cross-section requirement, whether or not he is a member of the excluded class." *Duren v. Missouri,* 439 U.S. 357, 359 n. 1, 99 S.Ct. 664, 666 n. 1, 58 L.Ed.2d 579 (1979).

1770, 20 L.Ed.2d 776 (1968), of serving as a link between the contemporary values of the total community and the penal system.

In *Taylor v. Louisiana*, 419 U.S. 522, 527, 530, 95 S.Ct. 692, 696, 697, 42 L.Ed.2d 690 (1974), the Supreme Court explained:

"[T]he Court has unambiguously declared that the American concept of the jury trial contemplates a jury drawn from a fair cross section of the community.

\* \* \* \* \* \*

"We accept the fair cross-section requirement as fundamental to the jury trial guaranteed by the Sixth Amendment and are convinced that the requirement has [a] solid foundation. . . . This prophylactic vehicle is not provided if the jury pool is made up of only special segments of the populace or if large, distinctive groups are excluded from the pool."

The *Taylor* Court, in considering the exclusion of women from jury service, strongly implied that the defendant need not show specific prejudice from any exclusion of a distinct group, for such an exclusion "deprived him of the *kind* of factfinder to which he was constitutionally entitled." (Emphasis supplied.) *Taylor, supra* at 526, 95 S.Ct. at 696.

The dissenting opinion of Justice Douglas in *Witherspoon* speaks directly to this issue. He states at 524, 95 S.Ct. at 1778:

"The constitutional question is whether the jury must be 'impartially drawn from a cross-section of the community,' or whether it can be drawn with systematic and intentional exclusion of some qualified groups to use Mr. Justice Murphy's words in his dissent in *Fay v. New York*, 332 U.S. 261, 296 [, 67 S.Ct. 1613, 91 L.Ed.2d 2043.]

"*Fay v. New York*, which involved a conviction of union leaders for extortion, was the 'blue ribbon' jury case in which the jury was weighted in favor of propertied people more likely to convict for certain kinds of crimes. The decision was 5–4, Mr. Justice Murphy speaking for Mr. Jus-

tice Black, Mr. Justice Rutledge, and myself:

" 'There is no constitutional right to a jury drawn from a group of uneducated and unintelligent persons. Nor is there any right to a jury chosen solely from those at the lower end of the economic and social scale. But there is a constitutional right to a jury drawn from a group which represents a cross-section of the community. And a cross-section of the community includes persons with varying degrees of training and intelligence and with varying economic and social positions. Under our Constitution, the jury is not to be made the representative of the most intelligent, the most wealthy or the most successful, nor of the least intelligent, the least wealthy or the least successful. It is a democratic institution representative of all qualified classes of people.' *Id.*, at 299–300 [, 67 S.Ct. 1613.]

"The idea that a jury should be 'impartially drawn from a cross-section of the community' certainly should not mean a selection of only those with a predisposition to impose the severest sentence or with a predisposition to impose the least one that is possible' "

and, at 528, 95 S.Ct. at 1780:

"I see no constitutional basis for excluding those who are so opposed to capital punishment that they would never inflict it on a defendant. Exclusion of them means the selection of jurors who are either protagonists of the death penalty or neutral concerning it. That results in a systematic exclusion of qualified groups, and the deprivation to the accused of a cross-section of the community for decision on both his guilt and his punishment."

 The cross-sectional, "representative" quality of a jury is a question apart from "guilt proneness" or "non-guilt proneness."[6] The requirement that juries be

6. In *Taylor* the Supreme Court accepted the fair-cross section requirement in order to make

available the commonsense judgment of the community as a check on arbitrary power.

drawn from a representative cross section of the community does not mean that any particular jury so drawn will in fact be a representative cross section of the community.[7] But here people were excluded by the Court from the guilt determining phase of the trial because of their *Witherspoon* opposition to the death penalty. If the jurors so excluded were not to have anything to do with the imposition of the sentence, their opposition to the death penalty would not likely interfere in any way with their assessment of the defendant's guilt or innocence. If it could be shown that it would interfere, then, of course, they could be excused for cause. For instance, if a juror on voir dire stated that he could not find a person guilty even if the facts and law warranted it because of his knowledge that, upon a finding of guilt, someone *else* might impose the death penalty, then that juror could be excused for cause. *Cf. Lock-*

*ett v. Ohio*, 438 U.S. 586, 596, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1977).

■ But in any event, *the Court itself* should not be the instrumentality which skews the representative nature of a jury by permitting the injection of considerations irrelevant to a "guilty" or "not guilty" determination. If the parties skew it by the use of their preemptories, they should not be heard to complain. Besides, it is assumed that these things even out. It is true, of course, that sometimes someone guesses wrong, and a jury may turn out to be more homogeneous than may be thought desirable.[8] Still, the Court itself should have nothing to do with destroying the cross section.[9]

The jury which convicted Witherspoon of murder did not have anyone on it who had conscientious scruples against capital punishment or who simply opposed capital punishment because *all* of such persons had

---

Such a requirement recognizes that jurors bring to their service a collective wisdom and body of experience which, taken together, reflect the conscience of the community. The guarantee that the jury be impartial, on the other hand, is accommodated by insuring, as nearly as possible, that each juror will base his decision on the law and the evidence and on no other basis. If a juror is predictably more likely to find guilt because of some other consideration, the fundamental fairness of the trial is eroded because that juror is not impartial in the sense required by the Sixth Amendment. Both requirements—selection from a fair-cross section and impartiality—are fundamental but they are not the same.

7. If all members of a religious group which believed in polygamy were excluded for cause in a bigamy trial simply because they were members of that religion, this would deprive the defendant of a "representative" jury. If, on the other hand, individual members of that religion on the jury panel stated on voir dire that they had strong feelings against the law *and* that they could not find a person guilty even if the facts and the law warranted it, such persons could be challenged for cause even if the end result was that all members of that religion were so excused.

8. Every trial judge has probably had the experience of ending up with 12 women on a jury drawn from a 50:50 panel. This results when the parties and their attorneys, on both sides, *believe* that women will favor their case more than men. The result is clearly an unrepresent-

ative jury. But cases like *Taylor v. Louisiana* clearly do not suggest that this type of skewing is bad, and this is because of the different, but equally important, policy behind peremptory challenges, to wit, that it is extremely important not only that the jury panel be fairly constituted but also that that the individual protagonists in particular trials start those trials with the *belief* that the jury is fair. If a particular defendant or litigant believes that blue-eyed men will be prejudiced against him, he can remove them through the exercise of his peremptory challenges. So the jury may in fact be irrationally skewed *by the parties*. But, even though there may be no rational basis for a party's exercise of his peremptory challenges, he nevertheless starts the trial with a more comfortable belief in the fairness of the resulting jury. And the law recognizes this as an important and valid consideration. Of course, peremptory challenges serve other purposes, too. There may be good and rational reasons for wanting a juror struck where a party simply cannot factually establish the "good cause" the law requires.

9. It is tempting to use the issue here as a basis for discussing the closely related questions of juror qualifications (and exemptions) established by legislation or court rule and proper voir dire limitations based upon the Sixth Amendment meaning of an "impartial jury" because, unless properly circumscribed, those qualifications and procedures can also distort the representative quality of the jury panel.

been removed upon challenges *for cause* under the Illinois statute. Mr. Justice Stewart noted in *Witherspoon, supra*, 391 U.S. footnote 16 at page 520, 88 S.Ct. 1770, that, in 1966, approximately 42% of the American public favored capital punishment for convicted murders, while 47% opposed it and 11% were undecided. Since the Illinois "for-cause" statute permitted challenges of anyone "opposed" to capital punishment, it must be surmised that Mr. Justice Stewart and the majority in *Witherspoon* understood that the jury which found Witherspoon guilty was essentially made up of a pool which excluded at least 47% of the population as a whole. The majority concluded that the jury so selected was *not* representative for the purpose of deciding the *sentence* to impose:

"[When] in a nation less than one-half of whose people believe in the death penalty, a jury composed exclusively of such people cannot speak for the community. Culled of all who harbor doubts about the wisdom of capital punishment—of all who would be reluctant to pronounce the extreme penalty—such a jury can speak only for a distinct and dwindling minority.

". . . But when it (the state) swept from the jury those who expressed conscientious or reluctant scruples against capital punishment and all who opposed it in principle, the state crossed the line of neutrality. In its quest for a jury capable of imposing the death penalty, the State produced a jury uncommonly willing to condemn a man to death."

The quoted language shows the conflict in analysis that permeates *Witherspoon*. The first part indicates that the vice is in not having a cross section, representative jury, and the latter part talks in terms of lack of "neutrality" or impartiality and in terms of a tendency to impose the death penalty ("uncommonly willing to condemn a man to death"). The Court required no empirical data or evidence to convince it of this tendency to impose the death penalty or to prove that such a jury was unrepresentative in the *sentencing phase* of the trial, but when the same argument was made in connection with the *guilt determination phase* of the case, the Court stated that such evidence would be required (i. e., that death-qualified jurors are partial to the prosecution on the issue of guilt). The Court stated that:

"We simply cannot conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction."

What did the majority in *Witherspoon* mean when it stated that it would have to be shown evidence "that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt"? Were they thinking in terms of a lack of impartiality? If so, that view appears to be contrary to the concept of the Sixth Amendment requirement of a representative jury as it is set forth in *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), with its clear implication that no prejudice need be shown when a jury is not properly representative.

The dissent of Justice White in the *Witherspoon* case is extremely interesting in this regard because of the footnote which he included. He disagreed with the majority that the exclusion of persons with scruples against the death penalty is improper at the sentencing stage. But in the footnote he states:

"While I agree generally with the opinion of Mr. Justice Black and so have joined it, I do not wholly foreclose the possibility of a showing that certain restrictions on jury membership imposed because of jury participation in penalty determination produce a jury which is not constitutionally constituted for the purpose of determining guilt."

What is this "showing" that Justice White refers to? In 1975, he wrote the majority opinion in the *Taylor* case. The unmistakable import of that opinion is that criminal defendants are entitled to a jury selected from a cross section of the community.

More particularly, he stated that a man could object to a system that excluded women from jury service because that system "deprived him of the kind of fact finder to which he was constitutionally entitled." It was not a question whether a jury composed of men only would be prejudiced or would have a "tendency" to convict or acquit; it was simply the requirement that the jury be selected from a panel representative of the community. As stated by Justice Douglas in his dissent in *Witherspoon*:

> ". . . We do not require a showing of specific prejudice when a defendant has been deprived of his right to a jury representing a cross-section of the community. . . . We can as easily assume that the absence of those opposed to capital punishment would rob the jury of certain peculiar qualities of human nature as would the exclusion of women from juries."

So the question arises whether *Witherspoon* would have been decided differently if it had been decided *after* Taylor. Certainly one would logically conclude that the exclusion of approximately 50% of the population because of scruples against the death penalty would result in an unrepresentative jury as analyzed in *Taylor.* But here in the *Grigsby* case the question is not quantitatively the same because the *Witherspoon* opinion itself now prevents the disqualification of persons for cause who have merely *general* scruples against capital punishment and permits the exclusion of only those who have *extreme* scruples, that is, those who would "automatically" vote against the death penalty. Therefore, the group now disqualified at the guilt determinative stage is a smaller sub-group of those who were excluded in determining Witherspoon's guilt.

We must now ask the question: must the petitioner show that the new *Witherspoon*-for-cause group is a large, distinctive group or a large, identifiable group before he can avail himself of the benefits of *Taylor*? To answer this question, it is important that we attempt to determine just what the Supreme Court meant in *Taylor*

and in the cases preceding *Taylor* when it stated that a jury must be drawn from a pool of persons representing a cross section of the community. And we must ascertain the effect of *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979).

In *Taylor* the Court reviewed prior cases discussing whether the presence of a fair cross section on the lists from which petit juries are drawn is essential to the fulfillment of the Sixth Amendment guarantee of an impartial jury in a criminal trial:

> ". . . [T]he Court has unambiguously declared that the American concept of the jury trial contemplates a jury drawn from a fair cross section of the community. A unanimous Court stated in *Smith v. Texas*, 311 U.S. 128, 130 [, 61 S.Ct. 164, 85 L.Ed. 84] (1940), that '[i]t is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community.' To exclude racial groups from jury service was said to be 'at war with our basic concepts of a democratic society and a representative government.' A state jury system that resulted in systematic exclusion of Negroes as jurors was therefore held to violate the Equal Protection Clause of the Fourteenth Amendment. *Glasser v. United States*, 315 U.S. 60, 85–86 [, 62 S.Ct. 457, 86 L.Ed. 680] (1942), in the context of a federal criminal case and the Sixth Amendment's jury trial requirement, stated that '[o]ur notions of what a proper jury is have developed in harmony with our basic concepts of a democratic system and a representative government,' and repeated the Court's understanding that the jury ' "be a body truly representative of the community" . . . and not the organ of any special group or class.' "

> \* \* \* \* \* \*

> "Some years later in *Carter v. Jury Comm'n*, 396 U.S. 320, 330 [, 90 S.Ct. 518, 24 L.Ed.2d 549] (1970), the Court observed that the exclusion of Negroes from jury service because of their race 'contravenes the very idea of a jury—"a body truly representative of the commu-

nity" . . . .' (Quoting from *Smith v. Texas, supra.*) At about the same time it was contended that the use of six-man juries in noncapital criminal cases violated the Sixth Amendment for failure to provide juries drawn from a cross section of the community, *Williams v. Florida*, 399 U.S. 78 [, 90 S.Ct. 1893, 26 L.Ed.2d 446] (1970). In the course of rejecting that challenge, we said that the number of persons on the jury should 'be large enough to promote group deliberation, free from outside attempts at intimidation, and to provide a fair possibility for obtaining a representative cross-section of the community.' *Id.*, at 100 [, 90 S.Ct. 1893]. In like vein, in *Apodaca v. Oregon*, 406 U.S. 404, 410–411 [, 92 S.Ct. 1628, 32 L.Ed.2d 184] (1972) (plurality opinion), it was said that 'a jury will come to such a [commonsense] judgment as long as it consists of a group of laymen representative of a cross section of the community who have the duty and the opportunity to deliberate . .. . on the question of a defendant's guilt.' Similarly, three Justices in *Peters v. Kiff*, 407 U.S., [493], at 500, [92 S.Ct. 2163, 33 L.Ed.2d 83] . . . observed that the Sixth Amendment comprehended a fair possibility for obtaining a jury constituting a representative cross section of the community.

"The unmistakable import of this Court's opinions, at least since 1940, *Smith v. Texas, supra*, and not repudiated by intervening decisions is that the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial."

In *Peters v. Kiff*, 407 U.S. 493, 502–504, 92 S.Ct. 2163, 2168–2169, 33 L.Ed.2d 83 (1972) (opinion of Marshall, J., joined by Douglas and Stewart, JJ.), it was stated:

"These principles compel the conclusion that a State cannot, consistent with due process, subject a defendant to indictment or trial by a jury that has been selected in an arbitrary and discriminatory manner, in violation of the Constitution and laws of the United States. Ille-

gal and unconstitutional jury selection procedures cast doubt on the integrity of the whole judicial process. They create the appearance of bias in the decision of individual cases, and they increase the risk of actual bias as well.

\* \* \* \* \* \*

"But the exclusion from jury service of a substantial and identifiable class of citizens has a potential impact that is too subtle and too pervasive to admit of confinement to particular issues or particular cases. . . .

"Moreover, we are unwilling to make the assumption that the exclusion of Negroes has relevance only for issues involving race. When any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable. It is not necessary to assume that the excluded group will consistently vote as a class in order to conclude, as we do, that its exclusion deprives the jury of a perspective on human events that may have unsuspected importance in any case that may be presented."

Justice White in *Taylor* insisted that a rational basis for the systematic exclusion of a class is not enough to defeat the guarantees of the Sixth Amendment. There must be something more. And he said, "What is a fair cross section at one time or place is not necessarily a fair cross section at another time or a different place." *Taylor, supra* 419 U.S. at 537, 95 S.Ct. at 701.

*Duren v. Missouri, supra*, more specifically sets forth the requirements for a prima facie showing of violation of the fair cross-section requirement set out in *Taylor*:

"In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a distinctive group in the community; (2) that the representation of this group in venires from which juries are selected is not fair

and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process."

The Eighth Circuit Court of Appeals has made it clear that the most important consideration in deciding whether there is indeed an identifiable group is whether the group holds a distinct attitude unrepresented by others on the jury. In the context of a challenge to the exclusion of 18 to 20-year-olds from jury service immediately after the ratification of the Twenty-sixth Amendment, Judge Matthes stated:

"The true basis of a challenge to the master list in this case must rest on the allegation that the compilation of the list excluded an identifiable community group, to wit: persons aged eighteen to twenty. Of course, '[n]either the jury roll nor the venire need be a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group.' *Swain v. Alabama*, 380 U.S. 202, 208, 85 S.Ct. 824, 829, 13 L.Ed.2d 759 (1965). However, since a jury is designed to 'express the conscience of the community,' *Witherspoon v. Illinois*, 391 U.S. 510, 519, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), '[t]he American tradition of trial by jury . . . necessarily contemplates an impartial jury drawn from a cross-section of the community.' *Thiel v. Southern Pacific Co.*, 328 U.S. 217, 220, 66 S.Ct. 984, 985, 90 L.Ed. 1181 (1946). Thus, juries must be indiscriminately selected 'without systematic and intentional exclusion of any . . . substantial portion of the community . . . that cannot be . . . excluded in whole or in part without doing violence to the democratic nature of the jury system.' *Id.*, at 220, 223, 66 S.Ct., at 985. This command flows from the requisites of both Due Process, *Peters v. Kiff*, 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972) (plurality opinion of Mr. Justice Marshall), and the Sixth Amendment, *Williams v. Florida*, 399 U.S. 78, 100, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970).

"Accordingly, the dispositive question is whether persons aged eighteen to twenty compose an 'identifiable group' which cannot be systematically excluded from jury service without rendering juries nonrepresentative of community attitudes. But appellant has 'failed to show that the attitudes of this group [18–20] are inadequately represented by those several years older than they, that is, that eighteen to twenty-one year olds are a distinct, cognizable group.' *United States v. Deardorff*, 343 F.Supp. 1033, 1043 (S.D.N.Y.1971). 'The difference in viewpoint between ages [eighteen to twenty and twenty-one to twenty-five, for example,] . . . would not seem to us of any great significance . . . . We regard it as highly speculative whether the decisional outlook of such excluded persons would be different than that of persons a mere few years older . . .' *King v. United States*, 346 F.2d 123, 124 (1st Cir. 1965). Accordingly, we hold that persons aged eighteen to twenty are not an identifiable group the exclusion of which renders a jury list nonrepresentative of the community and violative of the Fifth and Sixth Amendments."

*United States v. Olson*, 473 F.2d 686 (8th Cir. 1973).

It cannot be doubted that by that standard those excluded for cause pursuant to *Witherspoon* constitute an identifiable group. No one else will represent their strong viewpoint on the jury in their absence. Indeed, the United States Supreme Court itself has drawn the line to create the two, assumedly *different*, groups: those with mild scruples who may *not* be excused for cause and those who will never impose the death penalty who may be so excused. And the Supreme Court's analysis clearly suggests that the difference is not merely quantitative. The first group simply does not represent the absolutist attitude of the more strongly scrupled group. It may still be argued, however, that the Supreme Court was saying there is an important difference in the two groups when it comes to sentencing but not in relation to *guilt determination*. The predicate for that rea-

soning would be that there is no great difference between people with mild scruples against capital punishment and people with strong scruples against capital punishment except when assessing punishment; therefore, the anti-death penalty point of view will be adequately represented on a *Witherspoon* constituted jury charged with determining guilt only. The argument would be the same as with the exclusion of the 18–20 year age group in *Olson, i. e.,* others on the panel in the age group 21–25 would not have a significantly different point of view. However, even assuming the correctness of the age group decision, can it be said that the two *Witherspoon* groups substantially share the same pertinent point of view?

In the case *sub judice,* an identifiable group within the total community was excluded from the jury. That identifiable group, of course, consists of those who could not possibly, in conscience, return a death penalty. And the evidence indicates that this is not a small or insubstantial group within the general population. Dr. Brad Fisher[10] testified that a recent Harris poll indicates that over 30% of our population opposes the death penalty. The State did not dispute that statistic. Of course, all of those who stated their opposition in this poll would not automatically qualify for *Witherspoon* exclusion. Nevertheless, according to the evidence, a substantial number of people have consistently stated their scruples and many of them could not, if challenged under the Arkansas procedure, serve on a jury deciding guilt in a capital crime case. *See The Harris Survey,* Louis Harris & Associates, Inc., June 11, 1973, Table 314, which indicates that at least 16% of those polled would be excluded when *Wither-*

*spoon* is applied.[11] In this particular case, it was three of 38 who constituted the excluded group. It is clear that it is constitutionally forbidden to exclude blacks as an identifiable group from jury service. According to estimates by the United States Bureau of the Census, blacks constituted 11.6% of the population of the United States on July 1, 1977, less than the 16% identified by the Harris poll as absolutely refusing to vote for the imposition of the death penalty under any circumstances. The 16% thus makes up a large, identifiable group which is excludable under *Witherspoon* for cause and which is larger than another identifiable group which the Court has stated may not be excluded. On the basis of a qualification relevant only to *sentence* determinations, a group arguably constituting approximately 16% of the general population is totally excluded from *guilt* determination. It is difficult to see how such lack of representation could be considered fair or reasonable.

The final element of the prima facie showing is that the underrepresentation is due to the systematic exclusion of a particular group in the jury selection process. That such exclusion exists is obvious, made possible by voir dire questions and the *Witherspoon* disqualification for cause whenever *Witherspoon* standards are met. That exclusion applies even in the guilt determination phase of the trial.

As Justice White wrote in *Duren,* "[I]n Sixth Amendment fair-cross-section cases, systematic disproportion itself demonstrates an infringement of the defendant's interest in a jury chosen from a fair community cross section. The only remaining question is whether there is an adequate justification for the infringe-

---

**10.** Clinical corrective psychologist, Assistant Professor of Psychology at the University of North Carolina, and Acting Director of Dillon School.

**11.** Plaintiff moved to re-open the record to put this survey into evidence. That motion is hereby granted. A nationwide cross section of 1,537 people was asked, "Suppose you were being considered as a possible juror for a trial where if the person were convicted of the crime

he would automatically get the death penalty. If the job of the jury were just to decide whether or not the person was guilty, which statement on this card best describes how you would feel in advance of trial." Sixteen percent agreed that, "I could never vote guilty, even if guilt were proven, knowing the defendant would automatically receive the death penalty." People choosing that alternate would qualify for exclusion for cause.

ment," 439 U.S. at 368 n.26, 99 S.Ct. at 670 n.26. The exclusion may be justified only by the showing of a significant state interest, *Taylor, supra* 419 U.S. at 534, 95 S.Ct. 692, the burden to show the interest resting with the State.

■ It is obvious that the State has a significant interest in seeing that those who could *never* levy the death penalty not be allowed to participate in the assessment of the *sentence* in a capital case, else a single juror could effectively nullify the state legislature's determination that capital punishment should be an available, and might be the appropriate, punishment.

But that interest is not implicated when a scrupled juror is excluded for cause from guilt determination so long as the juror swears to decide the *guilt* issue on the basis of the law and evidence. That should be as far as the State's interest extends.[12] If this logic were followed, it might well be that in a capital case, different juries would be required to assess (1) guilt and (2) punishment if the State wishes to exclude jurors for cause on *Witherspoon* grounds. Otherwise, if the same jury decides *both* guilt and punishment, that jury could not be qualified on *Witherspoon* grounds at all, lest the jury for the initial, guilt determination phase be defectively representative[13] in violation of the constitutional guarantee.

At the hearing, evidence was offered to show that the practice of death qualifying the jury has additional exclusionary results. Studies have indicated that juries from which those with scruples against the death penalty are excluded tend to be less representative due to the proportionately larger exclusion of the poor, women, blacks, certain ethnic and religious groups, Democrats, unskilled workers, and Protestants. *See* Bronson, On the Conviction Proneness and Representativeness of the Death-qualified Jury, An Empirical Study of Colorado Veniremen, 42 U.Col.L.Rev. 1 (1970); Goldberg, Toward Expansion of Witherspoon; Capital Punishment Scruples, Jury Bias, and Use of Psychological Data to Raise Presumptions in the Law, 5 Harv.Civ. Rights—Civ.Lib.L.Rev. 53 (1963); V. Lee Hamilton, "Individual Differences in Ascriptions of Responsibility, Guilt, and Appropriate Punishment," paper prepared for Battelle Seattle Research Center Conference, June 12–14, 1975; Girsh, F. J., The *Witherspoon* Question: The Social Science and the Evidence, Sept. NLADA Briefs, 99 (1978).

Nor is the disproportionate exclusion of these groups without impact, in light of the study conducted by Mitchell and Byrne[14] which found that "trial by a jury of attitudinally similar peers versus attitudinally dissimilar non-peers could well result in quite different verdicts."

■ Given the above analysis and the repeated holdings of the Supreme Court that the required meaningful community participation cannot be attained with the exclusion of minorities or *other identifiable groups,* the exclusion on *Witherspoon* grounds of scrupled jurors from the guilt determination phase of a trial would seem to run afoul of the Sixth Amendment guarantees. There are, however, two roadblocks to this conclusion: (1) *Witherspoon* itself,

---

12. "Even so, a defendant convicted by such a jury in some future case might still attempt to establish that the jury was less than neutral with respect to *guilt.* If he were to succeed in that effort, the question would then arise whether the State's interest in submitting the penalty issue to a jury capable of imposing capital punishment may be vindicated at the expense of the defendant's interest in a completely fair determination of guilt or innocence—given the possibility of accommodating both interests by means of a bifurcated trial, using one jury to decide guilt and another to fix punishment. That problem is not presented here, however, and we intimate no view as to its proper resolution." *Witherspoon, supra* 391 U.S. at 520, n.18, 88 S.Ct. at 1776.

13. However, under Arkansas law, it is not possible to use different juries to assess guilt and decide the sentence. *See* Ark.Stat.Ann. §§ 41–1301 *et seq.* (1977).

14. H. Mitchell and D. Byrne, The Defendant's Dilemma: Effects of Jurors' Attitudes and Authoritarianism on Judicial Decisions, 25 Journal of Personality and Social Psychology 123 (1973).

and (2) the argument that the two scrupled *Witherspoon* groups (that is, those adamantly opposed to the death penalty and those mildly opposed to the death penalty) are not "distinctive" one from the other and that, therefore, if you exclude only one of such groups, the presence of the other group on the jury panel will still ensure that the jury is "representative." *Cf. Olson, supra.*

To make the point, it is necessary to repeat that in *Witherspoon* the Court held that when veniremen are excluded for cause on any basis broader than that they would automatically vote against the imposition of capital punishment, the death sentence cannot be carried out. The Court's reasoning rested on the jury's character as a representative cross section of the community. Citing public opinion polls, it noted that approximately half of United States citizens believed in the death penalty. So to exclude from the jury all of those who opposed the death penalty would result in an unrepresentative body. *Witherspoon* does not make it clear why this reasoning does not hold true where jurors are excluded because they are *absolutely opposed* to the death sentence when that jury is called upon to decide *guilt only* and there is no automatic death penalty.[15] Nevertheless, the Court obviously decided, *sub judice*, that that reasoning does not hold true in the latter situation.

■ This Court is, of course, aware that the group barred in *Witherspoon* was larger

than the group barred in this case. However, in view of cases decided subsequent to *Witherspoon* by the Supreme Court, it is not at all clear that the question concerning representation in the guilt determination phase of the trial would be answered the same way it appears to have been answered by the *Witherspoon* decision. See *supra*, p. 1380. But *Witherspoon* has not been specifically overruled, and this Court, hesitantly, concludes that it must follow that precedent. This conclusion is reinforced by the Court's belief that the Eighth Circuit and the Supreme Court might uphold *Witherspoon*, as here applied, even after, and in the face of *Taylor*, on the theory that no "*distinctive*" group has been excluded and that the State's interest in having *one* jury determine guilt *and* sentence would justify the removal of those adamantly opposed to capital punishment by for-cause challenges.[16] The petitioner will be denied relief on the ground that his constitutional right to a jury drawn from a fair representative cross section of the community was violated.

## II.

In 1968, the *Witherspoon* Court stated:

"The petitioner contends that a State cannot confer upon a jury selected in this manner the power to determine guilt. He maintains that such a jury, unlike one chosen at random from a cross-section of the community, must necessarily be biased in favor of conviction, for the kind

---

**15.** Take the other extreme: Would a for-cause challenge for all jurors who believed that the death penalty should be imposed upon conviction in *every* murder case be upheld? Should not the answer be "yes" when limited solely to sentence determination, where its relevance is obvious, and "no" when limited solely to guilt determinations where such belief would be irrelevant?

**16.** It may be argued that the State's interest in the efficiency of the same jury's determination of guilt and punishment supplies the justification for the prohibition of the most strongly scrupled jurors during the guilt determination phase. However, even measured by mere rationality, such minor convenience cannot be the justification for denial of juries selected

from a fair cross section when a man's life may be at stake.

But surely more than mere rationality is required here. As Justice White stated in *Taylor, supra* 419 U.S. at 534, 95 S.Ct. at 699:

"The right to a proper jury cannot be overcome on merely rational grounds. There must be weightier reasons if a distinctive class . . . of the eligible jurors is for all practical purposes to be excluded from jury service."

The defendant's Sixth Amendment right to a jury drawn from a fair cross section of the community cannot be overcome on merely rational grounds. It is far from clear to this Court that the required justification for the disparate jury composition apparent in this situation has been shown.

of juror who would be unperturbed by the prospect of sending a man to his death, he contends, is the kind of juror who would too readily ignore the presumption of the defendant's innocence, accept the prosecution's version of the facts, and return a verdict of guilt. To support this view, the petitioner refers to what he described as 'competent scientific evidence that death-qualified jurors are partial to the prosecution on the issue of guilt or innocence.'

"The data adduced by the petitioner, however, are too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt. We simply cannot conclude, either *on the basis of the record now before us or as a matter of judicial notice*, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction. In light of the *presently available information*, we are not prepared to announce a *per se* constitutional rule requiring the reversal of every conviction returned by a jury selected as this one was." (Footnotes omitted.) (Emphasis supplied.)

To supplement and make current the record available to the Supreme Court in 1968,[17] Grigsby presented expert witnesses and scientific studies to show that there is now sufficient evidence from which a court could, and should, find that a death qualified jury is more likely to find guilt than a jury not so qualified, and further, to show such evidence was also available in 1976 when he was tried. Thus, petitioner argues that, in refusing to permit a continuance to enable him to present this evidence, the state trial court abused its discretion sufficiently to require that he be given a new trial, particularly in view of the clear invitation found in *Witherspoon* that, in such cases arising thereafter, petitioners provide evidence to the Court that "the exclusion of jurors opposed to capital punishment . . . substantially increases the risk of conviction." This is precisely what Grigsby tried to do before his trial in 1976.

The plaintiff called Dr. Douglas Stevens, a clinical psychologist in private practice which includes forensic work. Based on his long experience and observation, rather than on any research studies, he concluded that there is no question but that a death qualified jury is more guilt prone than a

17. "In his brief, the petitioner cites two surveys, one involving 187 college students, W. C. Wilson, Belief in Capital Punishment and Jury Performance (Unpublished Manuscript, University of Texas, 1964), and the other involving 200 college students, F. J. Goldberg, Attitude Toward Capital Punishment and Behavior as a Juror in Simulated Capital Cases (Unpublished Manuscript, Morehouse College, undated). In his petition for certiorari, he cited a study based upon interviews with 1,248 jurors in New York and Chicago. A preliminary, unpublished summary of the results of that study stated that 'a jury consisting only of jurors who have no scruples against the death penalty is likely to be more prosecution prone than a jury on which objectors to the death penalty sit,' and that 'the defendant's chances of acquittal are somewhat reduced if the objectors are excluded from the jury.' H. Zeisel, Some Insights Into the Operation of Criminal Juries 42 (Confidential First Draft, University of Chicago, November 1957).

"During the post-conviction proceedings here under review, the petitioner's counsel argued that the prosecution-prone character of 'death-qualified' juries presented 'purely a legal question,' the resolution of which required 'no additional proof' beyond 'the facts . . . disclosed by the transcript of the voir dire examination . . . .' Counsel sought an 'opportunity to submit evidence' in support of several contentions unrelated to the issue involved here. *On this issue, however, no similar request was made, and the studies relied upon by the petitioner in this Court were not mentioned.* We can only speculate, therefore, as to the precise meaning of the terms used in those studies, the accuracy of the techniques employed, and the validity of the generalizations made. Under these circumstances, it is not surprising that the *amicus curiae* brief filed by the NAACP Legal Defense and Educational Fund finds it necessary to observe that, with respect to bias in favor of the prosecution on the issue of guilt, the record in this case is 'almost totally lacking in the sort of *factual information that would assist the Court.*'" (Emphasis supplied.)

*Witherspoon, supra* 391 U.S. at 517, n. 10, 11, 88 S.Ct. at 1774, n. 10, 11.

non-death qualified jury. The plaintiff also called Dr. Brad Fisher, a clinical correctional psychologist who teaches at the University of North Carolina and is the acting director of a maximum security facility for teenagers. He testified at length about the various studies which have been made and concluded that while each of them is less than perfect, taken together they have a remarkable cohesion and do show that authoritarian personalities are more prone to find guilt, and that those who are *not* against the death penalty are more authoritarian, generally, than those who oppose it. Dr. Robert Berry of the University of Arkansas at Little Rock, jointly appointed to teach psychology and criminal justice, agreed that the methodology of the studies could be improved, but that of the eight studies he had examined, seven supported the conclusion that a death qualified jury was guilt prone. The defense called Dr. Carl Hummel, assistant professor of psychology at the University of Arkansas at Little Rock, who seriously questioned the research methods used in the two studies which he examined. He feels that, because of their deficiencies, no legitimate scientific conclusions can be drawn from those studies one way or the other.

A number of studies were submitted in evidence for the Court to consider.[18] From these studies emerges the conclusion that in 1976 when the requested continuance was denied, there was, and at present there is, sufficient evidence from which a court could have found, and can find, that a death qualified jury is more likely to find guilt than is a jury chosen without regard to *Witherspoon* scruples against the death penalty.[19] Among the studies the Court has examined is Hamilton's, *supra.* His conclusions appear to be supported by the findings of Jurow, 1971; Vedman, 1974; Vedman and Crinklaw, 1973; Vedman and Ellsworth, 1974. Bronson, *supra*, in his 1970 study of Colorado veniremen, found that "[e]xcluding scrupled jurors from capital juries measurably increases the likelihood of a finding of guilt. . . ." Jurow, *supra*,[20] found a high, significant statistical

18. Boehm, Mr. Prejudice, Miss Sympathy, and the Authoritarian Personality: An Application of Psychological Measuring Techniques to the Problem of Jury Bias, 1968 Wisc.L.Rev. 734.

Girsh, The *Witherspoon* Question: the social science and the evidence. NLADA Briefs, Sept. 1978.

Hamilton, Individual Differences in Ascriptions of Responsibility, Guilt and Appropriate Punishment, 1975.

Jurow, New Data on the Effect of a "Death Qualified" Jury on the Guilt Determination Process, 84 Harv.L.Rev. 567 (1971).

Mitchell and Byrne, The Defendant's Dilemma: *Effects of Jurors' Attitudes and Authoritarianism on Judicial Decisions*, 25 Journal of Personality and Social Psychology 123 (1971).

Plus reference to:

Bronson, On the Conviction Proneness and Representativeness of the Death-qualified Jury: An Empirical Study of Colorado Veniremen, 42 U.Col.L.Rev. 1 (1970).

Crosson, Unpublished doctoral dissertation (1966).

Cucinotta, *Witherspoon*, 7 Duquesne L.Rev. 414 (1969).

F. J. Goldberg, Attitude Toward Capital Punishment and Behavior as a Juror in Simulated Capital Cases (unpublished manuscript, Morehouse College, undated).

Osser and Bernstein, Death Oriented Jury Shall Live, 1 Univ. of San Fernando Valley Rev. 253 (1968).

W. E. Wilson, Belief in Capital Punishment and Jury Performance (unpublished manuscript, U.T.1964).

H. Zeisel, Some Insights Into the Operation of Criminal Juries 42 (Confidential First Draft, University of Chicago, November 1957).

19. The Fifth Circuit's assertion in *Spinkellink v. Wainwright*, 578 F.2d 582 (5th Cir. 1978), that the defendant is asking for a defense-oriented jury in asking that juries be selected without regard to their scruples about the death penalty is simply not acceptable; only if there were exclusion of those who favor the death penalty would that be so. At any rate, implicit in the Fifth Circuit's analysis is an acceptance of the fact that a juror's attitude toward capital punishment influences his attitude toward guilt.

20. Jurow stated, at 589, about jurors whom he divided into five groups whose opinions ranged from total rejection of capital punishment (group 1) to strong approval of it (group 5):

"The idea that jurors should be selected from the broadest possible community base rests upon several beliefs. First, a democratic system presupposes an interest in making the jury as representative as possible. The long tradition of basing eligibility for jury

relationship between belief in capital punishment and determination of guilt in a simulated situation. White, *Constitutional Invalidity of Convictions Imposed By Death Qualified Juries*, 58 Cornell Law Rev. 11 (1973), concluded that the studies available in 1973 agreed that death qualified jurors are prosecution prone. The other studies examined by the Court tend to validate these conclusions that there appears to be a positive and consistent relationship between the degree to which one favors capital punishment and one's readiness to assess guilt.[21] There was one exception, the study by Osser and Bernstein, *supra*, in 1968, which was a statistical comparison of the conviction rate in capital and noncapital cases. The rate of conviction was lower in the capital cases, where presumably the juries were death qualified. While the authors concluded from these rates that death qualified juries have no greater propensities to convict than do heterogeneous juries, the

Court does not find that conclusion to necessarily follow from the data. Too many other causative factors are obviously operating in the situations compared.

The evidence in 1976, and now, is considerably less fragmentary and tentative than it was in 1968 when *Witherspoon* was decided.[22] It is substantial enough so that this Court concludes that the refusal of the trial court to allow a continuance so that the petitioner could attempt to make the evidentiary showing suggested in *Witherspoon*, of the guilt proneness of "death qualified" juries so seriously denigrated his constitutional right to an impartial jury that the denial amounted to an abuse of discretion.

The evidence brought forth in this habeas proceeding clearly suggests that the exclusion of those who unalterably oppose the death penalty may affect guilt determination.[23] In any event, petitioner should have

---

service on eligibility to vote, a common requirement in state courts, suggests this close connection between democratic, political and legal participation. In a practical sense, the more a jury is representative of society as a whole, the more its verdicts will be respected. Second, a requirement of representativeness supports the objective of impartiality. The risk of undetectable bias is greater when identifiable groups are arbitrarily excluded from juries. As four Supreme Court justices once said in arguing that jurors be drawn from the broadest base possible:

" 'We can never measure accurately the prejudice that results from the exclusion of certain types of qualified people from a jury panel. Such prejudice is so subtle, so intangible, that it escapes the ordinary methods of proof. It may . . . erode the jury system before it becomes evident.'

"Naturally, any juror will make decisions reflecting his own personal biases or dispositions. But bias due to arbitrary selection is avoidable and particularly intolerable because it prevents the kind of diffused impartiality which results from a broad mingling of persons with varying subsurface prejudices. Although excluding groups one, four, and five could be considered a rational exclusionary policy in an attempt to impanel a 'neutral' jury, the same objective of impartiality can be furthered by including *all* the groups while at the same time preserving the values of broad, representative participation."

21. One consistent imperfection of the studies is their failure to account for the interaction proc-

ess of jury deliberation. That failing may not be so great in view of Kalven and Zeisel's 1966 study reporting that in 3,500 cases with the Chicago Jury Project, 90% were decided by members of the jury before they deliberate. Boehm, *supra*, speculates that because authoritarians are more certain that they are correct, they will have greater influence on the group than will equalitarians.

22. The Court in *United States ex rel. Townsend v. Twomey*, 322 F.Supp. 158 (N.D.Ill.1971), after hearing evidence from Dr. Hans Zeisel, arrived at the conclusion suggested by petitioner with less evidence than is now before this Court. The Seventh Circuit Court of Appeals, indicating that only one study had been added to those before the *Witherspoon* court, reversed on the basis that the evidence was still tentative and fragmentary. 452 F.2d 350 (7th Cir. 1972), *cert. denied*, 409 U.S. 854, 93 S.Ct. 190, 34 L.Ed.2d 98.

23. In a series of cases considering the issues of jury size and the requirement of unanimity, the Supreme Court apparently has applied the test of functional equivalency, that is, that differences in form may be allowed and do not offend the Constitution if the differences in form do not result in any functional difference. In *Ballew v. Georgia*, 435 U.S. 223, 98 S.Ct. 1029, 55 L.Ed.2d 234 (1978), the Court used empirical studies to arrive at its judgment that a jury should consist of at least six. In *Johnson v. Louisiana*, 406 U.S. 356, 92 S.Ct. 1620, 32

been given the opportunity to convince the trial court that sound empirical data supports the intuitive, "gut" reaction of prosecutors[24] and defense counsel alike that death qualified juries are more likely to convict. Even if the trial court did not agree, a record could have been made to submit to the Arkansas Supreme Court and, if necessary, to the United States Supreme Court.

### III.

Beginning with *United States v. Wood*, 299 U.S. 123, 57 S.Ct. 177, 81 L.Ed. 78 (1936), through *Baker v. Hudspeth*, 129 F.2d 779 (10th Cir. 1942), to *Farese v. United States*, 428 F.2d 178 (5th Cir. 1970), courts have reiterated that the concept of impartiality is not a static concept. In *Wood*, the question was whether the absolute disqualification of government workers as jurors in criminal cases was essential to have an impartial jury. That court, after reviewing the common law and English origins of that disqualification, insisted that, "Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula." As science advances our understanding and insight and as our society itself changes, so may the specific institutional methods of assuring that the impartiality which is guaranteed by the Sixth Amendment be, indeed, delivered.

Since 1968, additional empirical data has become available to the Court and the concept of impartiality has further evolved through court decisions. Unless and until the Supreme Court decides, *as a matter of law*, that death qualified juries are *not* more likely to convict than non-death qualified juries, it should be open to defendants in capital cases to prove that, *in fact*, death qualified juries are more prone to convict as they were invited to do in *Witherspoon.*

The State has raised the spectre of dire results from changing the current rules on exclusion of jurors who are totally opposed to capital punishment. In particular, it is alleged that there will be a great flood of petitions for post-conviction relief. However, the problem may be more apparent than real if reliance on *Grigsby* is limited to those who properly raised the impartiality argument beginning with the 1968 *Witherspoon* invitation. In any event, such considerations cannot control when dealing with such important constitutional rights.

This Court must conclude that there is sufficient evidence to indicate that the denial of the requested continuance was an abuse of discretion.

It is therefore Ordered that this cause be, and it is hereby, remanded to the Franklin County Circuit Court for a new trial if the

L.Ed.2d 152 (1972), the Court relied on its own long-standing perception that the agreement of 9 of 12 jurors was sufficient for the conviction of a criminal defendant. Additionally, in *Williams v. Florida*, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970), *Apodaca v. Oregon*, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972), *Colgrove v. Battin*, 413 U.S. 149, 93 S.Ct. 2448, 37 L.Ed.2d 522 (1973), and *Burch v. Louisiana*, 441 U.S. 130, 99 S.Ct. 1623, 60 L.Ed.2d 96 (1979), the test applied was that of functional equivalency, whether based on empirical studies or not. *See generally,* Sperlich, *And Then There Were Six,* 63 Judicature 262 (1980).

If, indeed, this is to be the test to be applied to determine whether a jury which is *Witherspoon* qualified meets constitutional standards, the necessary showing is that the difference in the makeup of such a jury, as compared to a jury selected without regard to attitudes towards capital punishment for the determination of guilt, results in a functional difference in the operation of that jury. The studies offered by the social scientists indicate that there is at least a colorable claim that there is a functional difference; that juries which exclude "scrupled" members are more likely to find guilt and thus are different in a vital way from a jury composed of a more random cross section.

24. It should be noted here that as soon as the prosecutor got a "guilty" verdict he waived the death penalty. Why? If he knew from the beginning that he would not press for the death penalty, then one could argue that he first stated that the State would seek the death penalty in order to get a "death qualified" jury, one that he felt would more likely convict than a non-death qualified jury.

State chooses to prosecute again on the charge of capital felony murder. At the trial, defendant shall be given an opportunity to present evidence on the motion that potential jurors opposed to capital punishment not be excluded for cause during the guilt determination phase of his trial.

## ON MOTION TO RECONSIDER AND AMEND JUDGMENT

Pending before the Court is the respondent's motion to reconsider and amend the judgment which was filed on January 28, 1980, by this Court. In that judgment the Court held that the trial court abused its discretion in not granting the defendant a continuance so that he could attempt at a pretrial hearing to show that "death qualified" juries are guilt prone and that trial by such a jury would deny his constitutional right to an impartial jury. The Court remanded the cause to the Franklin County Circuit Court for a new trial (if the State chooses to prosecute again) at which time the defendant first must be given an opportunity to make his proposed showing concerning death qualified juries.

The respondent objects to this remedy. He alleges that the State would be barred from seeking the death penalty, since the defendant was sentenced to life without parole in his first trial. That being the case, there would be no reason to "death qualify" the jury and the issue of the impartiality of a jury so constituted would never arise. The State suggests instead that this Court modify its Order by remanding the case to the trial court for the limited purpose of an evidentiary hearing to consider whether a jury, from which those who strongly object to the death penalty

are excluded, can be an impartial jury, as required by the Constitution. Only if the trial court decides that such a jury is "guilt prone" would there be a need for a new trial. In that case, the defendant would get what he is entitled to, a trial by an impartial jury should the State decide to try him again. But should the Franklin County Circuit Court find that jury from which strongly scrupled jurors are excluded is an impartial jury, then there is no need for a second trial. The abuse of discretion would be cured and the jury which actually tried him would be vindicated and declared to have been impartial and thus constitutional by the trial court, thereby obviating any need for a second trial.

■ The Court is persuaded that there is merit in the respondent's claim. Defendant Grigsby will have his day in court to make his showing and if he succeeds, he will be entitled to a new trial by an impartial jury. Indeed, the respondent's motion points out that the Arkansas trial court would order a new trial if it did in fact find, after an evidentiary hearing, that "death qualified" juries are guilt prone. But if the defendant fails to make that showing, he can file an appeal squarely confronting the question presented herein.[1]

Certainly, if the required showing is not made, the State should not be required to retry the defendant.[2] Under this possible outcome, given the determination by the trial court that death qualifying a jury is without effect on the jury's impartiality, the fact that the prosecutor waived the death penalty after impaneling the jury becomes irrelevant.

Upon remand for a hearing in the trial court, the defendant will be entitled to

---

1. The defendant submits that no appeal from an adverse decision on such a preliminary motion will be available to petitioners in the Arkansas courts. Perhaps. Perhaps not. The record of the evidentiary hearing, together with the trial record and verdict of conviction, might well be considered to constitute a final judgment which can be appealed. Appeal of a conviction in a criminal case is a matter of right pursuant to Rule 36.1 of the Arkansas Rules of Criminal procedure (A.R.Cr.P.).

Since the question presented is one of constitutional magnitude, concerning as it does the right to an impartial jury, this Court will take such action as is required to insure review of the trial court's decision. The State's right to appeal this preliminary determination, should it choose to do so, is, of course, set forth clearly in Rule 36.10 of A.R.Cr.P.

2. If, however, petitioner can only appeal the pretrial ruling after a second full trial, then such trial will be required.

proffer any evidence which might have been available to him at the time of his trial.[3]

It is therefore Orderd that the motion to reconsider and amend judgment is granted.

It is Ordered that on page 26 of the Memorandum and Order entered January 28, 1980, the language of paragraph 4, which reads:

. . . it is hereby, remanded to the Franklin County Circuit Court for a new trial if the State chooses to prosecute again on the charge of capital felony murder. At the trial, defendant shall be given an opportunity to present evidence on the motion that potential jurors opposed to capital punishment not be excluded for cause during the guilt determination phase of his trial.

be replaced by the following language:

. . . it is hereby, remanded to the Franklin County Circuit Court so that the defendant may have an opportunity to present evidence on the motion that potential jurors opposed to capital punishment not be excluded for cause during the guilt determination phase of his trial.

If that motion is granted by the trial court, it is further Ordered that the Franklin County Circuit Court grant the defendant a new trial by a jury selected without regard to opposition to the death penalty, assuming, of course, that the State chooses to prosecute again on the charge of capital felony murder.

If the motion is denied, it is further Ordered that the defendant be allowed to appeal the trial court's decision should he choose to do so or, in the event that such decision is not an appealable Order under the laws of the State of Arkansas as interpreted by the courts of that State, the defendant shall be entitled to a new trial conducted subsequent to the trial court's decision.

It is further Ordered that said evidentiary hearing commence not later than May 31, 1980; otherwise petitioner is to be released by June 1, 1980.

3. The fact that in his motion he specified two particular expert witnesses would not have precluded him from presenting other relevant testimony as well.