409 So.2d 85 (1982)
Stephen Wayne NETTLES, Appellant,
v.
STATE of Florida, Appellee.
No. UU-209.
District Court of Appeal of Florida, First District.
January 18, 1982.
Rehearing Denied February 23, 1982.
*86 Michael Allen, Public Defender, and Melanie Ann Hines, Asst. Public Defender, for appellant.
Jim Smith, Atty. Gen., and Lawrence A. Kaden, Asst. Atty. Gen., for appellee.
PER CURIAM.
Nettles appeals his conviction for first degree murder raising several issues, only two of which merit extensive discussion: 1) Whether a defendant is denied a fair trial when the jury is death-qualified,[1] and 2) whether appellant's incriminating statements should have been suppressed? We resolve both questions adversely to appellant, and affirm the judgment of conviction.
Nettles was indicted for first degree murder in the killing of Donald Attaway. The defense made numerous pre-trial motions to have the death penalty stricken as a possible penalty, all of which were denied. The prosecutor challenged and the judge excused for cause any juror who was adamantly opposed[2] to the death penalty. During his rebuttal to defense closing argument, the prosecutor announced the state would not seek the death penalty. Appellant was convicted for first degree murder and received a life sentence.
Appellant argues that by excluding all persons who would not impose the death penalty under any circumstances the state obtained a jury that was more likely to return a conviction of the crime charged, thereby denying defendant a fair and impartial jury drawn from a representative cross section of the populace. Appellant also urges that it was improper to exclude from the guilt or innocence phase of the trial those opposed to the death penalty who could fairly apply the law on the question of guilt.
We first address the question of standing. This issue was indirectly raised by the state by the filing of a notice of supplemental authority citing Herman v. State, 396 So.2d 222 (Fla. 4th DCA 1981), in which the court ruled that a defendant who does not receive the death penalty has no standing to challenge the exclusion of jurors opposed to the death penalty. Without determining whether the issue was properly raised, we respectfully disagree with the Fourth District. Assuming appellant's thesis concerning the lack of impartiality of the "death-qualified" jury to be correct, he would have suffered harm by virtue of the exclusion of all jurors adamantly opposed to the death penalty.
We next deal with the question of whether such a jury is sufficiently representative to meet constitutional requirements. A review of Florida and federal cases reveals that this question has been resolved adversely to appellant's position. In Riley v. State, 366 So.2d 19 (Fla. 1978), the appellant urged that he was entitled to have persons who were unalterably opposed to the death penalty on his jury for the determination of guilt or innocence and suggested that a second jury qualified pursuant to the Witherspoon[3] *87 standards could be impaneled for the sentencing phase. The Florida Supreme Court rejected this argument because it found "no compulsion in law or logic to so structure capital case trials." Accord Jackson v. State, 366 So.2d 752 (Fla. 1978); Gafford v. State, 387 So.2d 333 (Fla. 1980); Maggard v. State, 399 So.2d 973 (Fla. 1981). We find the decisions of the Florida Supreme Court in this area consistent with that of the U.S. Supreme Court in Witherspoon which concluded that a jury composed of only those who were not absolutely opposed to the death sentence was sufficiently representative on the issue of guilt. See Grigsby v. Mabry, 483 F. Supp. 1372 (E.D.Ark.), reversed and remanded on other grounds 637 F.2d 525.
The law is not so well-settled with regard to the impartiality of such a jury.[4] In Witherspoon, 391 U.S. at 520, note 18, 88 S.Ct. at 1776, the Supreme Court stated:
Even so, a defendant convicted by such a jury in some future case might still attempt to establish that the jury was less than neutral with respect to guilt.

Thus, the court left open the question of whether a jury which is death-qualified is more prone to convict of the crime charged than one on which adamantly opposed persons are seated. The Witherspoon court declined to resolve the question because the data produced by the petitioner were "too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt." 391 U.S. at 517, 88 S.Ct. at 1774. Subsequent to Witherspoon, several defendants have accepted the court's invitation to prove the point, and the courts which have addressed the issue are not in agreement.
In Spinkellink v. Wainwright, 578 F.2d 582 (5th Cir.1978), the Fifth Circuit appears to have rejected the argument outright on the basis that the state's interest in evenhanded application of its laws, and in providing an impartial jury, are too fundamental to risk a defendant-prone jury by allowing inclusion of those adamantly opposed to the death penalty, even at the guilt phase of the trial.[5] The Seventh Circuit,[6] and the Eighth Circuit,[7] have accepted in theory the proposition that a death-qualified jury could be more conviction prone and therefore not impartial. The Seventh Circuit, in the Townsend and Clark cases, found that the evidence still is not sufficient to establish a lack of impartiality. The Clark court noted that new studies (as well as those considered in Townsend) did show a pattern of correlation between a juror's attitude toward the death penalty and his attitude toward conviction, but the court nevertheless could not say that these new studies were sufficient to dispel the *88 "`fragmentary and tentative' nature of the data or significantly increase the empirical evidence on the question." 538 F.2d at 762. The Eighth Circuit, in Grigsby v. Mabry, supra, remanded to the Federal District Court for an evidentiary hearing on the question.
We are inclined, following the Fifth Circuit's reasoning in Spinkellink, to reject outright appellant's contention with respect to jury impartiality. However, we feel there is adequate basis for a decision affirming the lower court without rejecting appellant's impartiality argument as a matter of law. Here, appellant's "proof" consisted of a transcript of testimony given by a psychologist in another trial, which was accepted by the trial judge in lieu of live testimony. This witness gave her expert opinion, based upon her own psychological studies and experiments, as well as the studies, surveys and opinions of others that a death-qualified jury is more guilt-prone than a jury not so qualified. Although we do not question the expertise of the witness, at the same time we do not find the presentation on this issue overly persuasive, and we have no difficulty in accepting the trial judge's failure to be convinced by it. It is well settled that expert testimony is not binding on the trier of facts. South Venice Corp. v. Caspersen, 229 So.2d 652 (Fla. 2nd DCA 1969); Trolinger v. State, 300 So.2d 310 (Fla. 2nd DCA 1974); State v. Ward, 374 So.2d 1128 (Fla. 1st DCA 1979). The court has discretion to accept or reject the opinion of an expert even though it is uncontroverted. Robertson v. Robertson, 106 So.2d 590 (Fla. 2nd DCA 1958). Behm v. Division of Administration State Dept. of Transportation, 292 So.2d 437 (Fla. 4th DCA 1974), approved 336 So.2d 579 (Fla. 1976).
Appellant urges, however, that the prosecutor's behavior in first demanding the death penalty and then changing his position during closing argument distinguishes this case, necessitates more stringent review, and compels the conclusion that Nettles was deprived of a fair trial. Appellant urges that the prosecutor knew from the beginning that the death penalty would not be invoked by the state and only pursued it in order to get a death-qualified jury. Since we are unable to conclude, based on this record, that the prosecutor acted in bad faith, we find it unnecessary to further address appellant's contentions on this point. We observe, however, that in view of the nature of the evidence, which might reasonably justify the conclusion that appellant committed a cold-blooded and ruthless killing after stalking his prey as a hunter would game, we cannot say that it was a foregone conclusion that a jury would not be called upon to consider the death penalty. Therefore, we affirm on this issue.
We also affirm the trial judge's ruling that appellant's various inculpatory statements were voluntarily given and therefore admissible. The relevant facts are as follows:
At approximately 8 p.m. on August 9, 1979, Nettles shot and killed Donald C. Attaway in the parking lot of the TG&Y in Callahan, Florida. Based on an eyewitness description, Nettles was stopped at a roadblock near Folkston, Georgia. Officer Harris of the Callahan Police Department testified he arrested Nettles, advised him of his constitutional rights and asked him if he wanted to make a statement. Nettles said "No." Nettles was taken to the Charlton County, Georgia Jail, placed in a cell and again asked if he wanted to make a statement. He stated, "Why, you are going to fry me." Harris replied, "Well, if you do cooperate it will make it a little easier." Nettles then asked Sheriff Gibson, the local sheriff, what he should do and was told he would have to make that decision himself. At this point, Nettles apparently changed his mind about talking and stated he would make a statement after his father, who lived in Folkston, arrived.
Shortly thereafter, Officer Hines, also of Florida arrived at the jail. He advised Nettles of his constitutional rights and again Nettles said he would make a statement after his father came. Hines testified that in advising Nettles of his rights, "I asked *89 him if he would talk with us without benefit of a lawyer because we would not be able to have one furnished at that time." After speaking with his father, Nettles gave Hines an oral statement, agreeing to put it in writing later. He waived extradition and was returned to Florida that same evening. Enroute to Florida, Harris again advised Nettles of his rights and Nettles made certain inculpatory statements. Upon arrival at the Nassau County Jail, after being booked and again warned, Nettles gave a written statement.
Appellant first urges the statements were induced by Officer Harris' comment. We note that, in fact, appellant did not make a statement in response to this comment. After speaking with Sheriff Gibson he merely indicated a willingness to do so at a later time. He actually made the statement only after seeing his father and after he had again been given the Miranda[8] warnings. Looking to the totality of the circumstances, we cannot conclude that Harris' statement was such an inducement or promise of leniency as to make the subsequent confession involuntary. In Interest of G.G.P., 382 So.2d 128 (Fla. 5th DCA 1980), State v. DeConingh, 396 So.2d 858 (Fla. 3rd DCA 1981); and see Hawkins v. Wainwright, 399 So.2d 449 (Fla. 4th DCA 1981). Furthermore, even if this comment should be considered as holding out an improper inducement or suggestion of benefit, its effect was sufficiently attentuated by the conversation with Sheriff Gibson, the arrival of appellant's father, and the additional warnings by Officer Hines, so as to remove any suggestion that his statements were obtained by improper means. Compare Brewer v. State, 386 So.2d 232 (Fla. 1980); Gaspard v. State, 387 So.2d 1016 (Fla. 1st DCA 1980); State v. Outten, 206 So.2d 392 (Fla. 1968); State v. Oyarzo, 274 So.2d 519 (Fla. 1973).
Appellant next urges the confessions were fatally tainted because of Officer Hines' confusing comments regarding the right to counsel. At first blush, Hines' comments would appear to be misleading and confusing. However, questioning of Hines at the trial revealed that he simply explained to Nettles that he was entitled to an attorney, and if Nettles requested an attorney there would be no continuation of the conversation until one was available. Nettles never indicated he wanted an attorney.[9] Taking the entire conversation into account, we conclude that Nettles was adequately apprised of his right to counsel and of his right to remain silent unless counsel was present.
Finally, appellant argues that the repeated attempts at interrogation after Nettles expressed a desire to remain silent constituted harassment in violation of Miranda.
In Miranda, 384 U.S. at 473-474, 86 S.Ct. at 1627 the court stated:
Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.
In Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), the Supreme Court found that a reasonable interpretation of this language meant only that the right of a defendant to cut off questioning must be "scrupuously honored." The court *90 specifically noted that it did not mean that a person who had invoked his right to remain silent could never again be subjected to custodial interrogation by any police officer at any time or place on any subject. Nor did the passage mean that the police officer could cease questioning and then resume it after only a momentary respite. In Rivera Nunez v. State, 227 So.2d 324 (Fla. 4th DCA 1969), the court addressed the admissibility of a confession obtained after the defendant initially stated he did not want to answer questions without consulting an attorney. In concluding that the initial assertion of the right to counsel does not preclude a later waiver of the right to counsel, the court cited State v. Bishop, 158 S.E.2d 511 (N.C. 1968):
The vice sought to be removed is the evil of continued, incessant harrassment by interrogation which results in breaking the will of the suspect, thereby making his statement involuntary.
Id. at 325. Consistent with the interpretations later announced by the Mosley court, the Bishop court determined Miranda did not mean law enforcement officers could never resume questioning after a defendant invoked his right to remain silent. Here, Nettles was arrested at a roadblock near Folkston, Georgia. He was given his rights and refused to talk. He was then taken to the Charlton County Jail where the above described conversation with Officer Harris took place. Both at the time of arrest and at the jail, Harris merely asked Nettles if he wanted to talk. The questions were brief and nonspecific as to details of the crime. Such questions can hardly be considered "continued, incessant harrassment" designed to break the will of the suspect. In response to Harris' second query, Nettles agreed to talk once his father arrived. We construe this as a clear indication he had changed his mind and was now willing to make a statement. A defendant is entitled to waive his right to remain silent, the question becoming whether the waiver was freely and intelligently made. Franklin v. State, 324 So.2d 187 (Fla. 1st DCA 1975). The record here does not indicate Nettles' waiver was anything other than voluntary.
Appellant's other issues can be disposed of summarily. All of the alleged errors involve matters in which the trial judge has significant discretion, and appellant has failed to show any abuse of that discretion. See Ashley v. State, 370 So.2d 1191 (Fla. 3rd DCA 1979); Chaney v. State, 267 So.2d 65 (Fla. 1972); Thomas v. State, 326 So.2d 413 (Fla. 1976).
Accordingly, the judgment of conviction is AFFIRMED.
ROBERT P. SMITH, Jr., C.J., and LARRY G. SMITH and JOANOS, JJ., concur.
NOTES
[1] All persons who could not impose the death penalty under any circumstances are excluded.
[2] Those who would not impose the death penalty under any circumstances.
[3] Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).
[4] The Florida cases cited in the preceding paragraph dealt with the question of the representativeness of the jury, not its impartiality. The Florida Supreme Court has not specifically addressed the impartiality issue. It would seem, however, that since the acceptance and application of appellant's thesis would result in the necessity for dual juries in every capital case, the rationale employed by the court in these cases would apply as well to the question of impartiality.
[5] "... The state has decided that the parties' right under the Sixth and Fourteenth Amendments to an impartial trial and the state's interest in the just and evenhanded application of its laws, including Florida's death penalty statute, are too fundamental to risk a defendant-prone jury from the inclusion of such veniremen. The Constitution does not prohibit this judgment... . (citations omitted) The jury that emerges after excluding such veniremen, having been carefully examined to exclude also for cause those veniremen who are biased against the defendant, either as to guilt or as to punishment, is impartial. To call it prosecution-prone is to misunderstand the meaning of impartiality. Accordingly, the petitioner's contention is without merit." Spinkellink, 578 F.2d at 596.
[6] United States ex rel. Townsend v. Twomey, 452 F.2d 350 (7th Cir.1972), cert. den. 409 U.S. 854, 93 S.Ct. 190, 34 L.Ed.2d 98; United States ex rel. Clark v. Fike, 538 F.2d 750 (7th Cir.1976), cert. den. 429 U.S. 1064, 97 S.Ct. 791, 50 L.Ed.2d 781.
[7] Grigsby v. Mabry, 438 F. Supp. 1372 (E.D. Ark.), reversed and remanded on other grounds 637 F.2d 525 (1980).
[8] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[9] Since appellant did not request counsel, we are not concerned with the recent holding of Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378, which extended the Miranda rule so as to preclude further police questioning after the accused clearly asserts his right to counsel.