**STATE of Missouri, Respondent,**

v.

**Frank J. GUINAN, Appellant.**

No. 64074.

Supreme Court of Missouri,
En Banc.

Feb. 15, 1984.

Rehearing Denied March 20, 1984.

Robert A. Hampe, St. Louis, for appellant.

John Ashcroft, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for respondent.

BILLINGS, Judge.

Defendant Frank Joseph Guinan was convicted of capital murder of penitentiary inmate John McBroom and his punishment fixed at death, the jury finding the following statutory aggravating circumstances: defendant had a substantial history of serious assaultive criminal convictions [§ 565.-012.2(1)]; the murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture, or depravity of mind [§ 565.012.2(7)]; and, that at the time of the murder defendant was in the lawful custody of a place of lawful confinement [§ 565.012.2(9)].

In this appeal defendant challenges the sufficiency of the evidence to support his conviction, attacks the constitutionality of Missouri's death penalty, contends he was prejudiced by the jury selection procedures employed at his trial, and avers certain evidence and courtroom security measures deprived him of a fair trial. We affirm.

Initially, we consider defendant's point that the evidence was insufficient to support the guilty verdict. In so doing, we view the evidence in the light most favorable to the State, together with all reasonable inferences to be drawn therefrom, and ignore contrary evidence and inferences. *State v. Bolder,* 635 S.W.2d 673, 679 (Mo. banc 1982), *cert. denied,* — U.S. —, 103 S.Ct. 770, 74 L.Ed.2d 983 (1983).[1]

Defendant was an inmate at the Missouri State Penitentiary and celled with Richard Zeitvogel[2] in a ground floor cell of Housing Unit 4. This building housed 296 inmates and consisted of four tiers of cells on either side of the building. The victim, John McBroom, and William Houchin were cellmates of cell 36 which was located on the second tier of cells.

Because January 25, 1981, fell on Sunday, Sergeant Matthias was the only correctional officer on duty in Unit 4. He was located in a booth on the ground floor from which he could observe all cells. About 10:30 a.m., the officer began to notice what he considered unusual and suspicious behavior on the part of several inmates. Inmates Sherrill, Cleveland and Hewitt had left the places where they normally "hung out" and had taken up positions where they could watch the officer; defendant and Zeitvogel made several trips to upper tiers; and, beginning at 10:55 a.m., Cleveland and Hewitt made requests of the officer that he ring the buzzer for "mainline"—a term for the time when most inmates went to their noon meal. The request for "mainline" was considered extraordinary and highly suspicious by the officer because inmates were free to go to lunch before "mainline" sounded. "Mainline" causes a considerable increase in noise and movement within the building.

A few minutes after 11:00 a.m., when the officer saw defendant and Zeitvogel go

1. The statement of facts in defendant's brief falls far short of being a "fair and concise statement" as required by Rule 30.06(c). Defendant's statement totally ignores the State's evidence and relies entirely on testimony offered by defense witnesses.

2. Zeitvogel was also convicted of capital murder in the killing of McBroom and sentenced to life imprisonment with no possibility of parole for fifty years. *State v. Zeitvogel,* 655 S.W.2d 678 (Mo.App.1983).

back upstairs another time and Cleveland made another request for "mainline", Sergeant Matthias called his shift captain, Captain Borghardt, and told him something was wrong and he had the feeling he was going to need some help. The captain immediately summoned two other officers and headed for Unit 4.

■ Shortly after the sergeant made the telephone call but before assistance arrived, he saw defendant and Zeitvogel emerge from cell 36. Both men were covered with blood and each was carrying a knife made from scissor halves. As defendant was attempting to close the cell door to cell 36 he saw Sergeant Matthias watching him. Defendant and Zeitvogel started running from that area. As defendant entered a catwalk which connected cell tiers on opposite sides of the building, he confronted inmate Joseph Camillo who had also drawn a knife. At this point Captain Borghardt arrived with two other officers. Camillo retreated off the catwalk to allow the captain to get between him and the defendant. Defendant threatened Camillo, calling him a "snitch" and telling Camillo that "I killed your punk and I'll kill you too". The captain asked Camillo to surrender his weapon and Camillo said he would as soon as defendant and Zeitvogel were disarmed. The captain made similar requests of defendant and Zeitvogel and they refused while defendant made several swings with his knife at the unarmed captain. At this point inmate Medley, cellmate of Camillo, appeared on the tier nearest defendant and Zeitvogel. Medley was carrying an electric fan in one hand and a hammer in the other. Zeitvogel, spotting Medley, referred to him as "the other snitching son-of-a-bitch" and said "let's get him". With that, defendant and Zeitvogel charged at Medley. As defendant was attempting to stab Medley, Captain Borghardt grabbed defendant from behind and attempted to disarm him. Defendant attempted to break away from the officer's

grasp and tried to stab him. Defendant was finally subdued with the help of another officer. Both the captain and the officer assisting him were cut on their hands by defendant's knife. Zeitvogel was disarmed by other officers.

During the flight and capture of defendant and Zeitvogel, Sergeant Matthias saw inmate McBroom come out of cell 36,[3] covered with blood and bleeding profusely. McBroom collapsed outside the cell and was taken to the prison hospital where he was pronounced dead at 11:27 a.m., as a result of massive blood loss. He had suffered at least 16 separate stab wounds, including three around the left eye which had penetrated into the brain, and others in the chest and back which had severed major blood vessels in the liver and right lung. Six of the stab wounds were in the victim's back or posterior shoulder area.

Immediately after being taken into custody, defendant and Zeitvogel were physically examined and photographs were taken of them. The examinations and photographs revealed that except for a superficial scratch on defendant's left upper arm neither man had any cuts, bruises, abrasions or other injuries. The blood on their clothing and on the knife defendant carried was found to match that of McBroom. The victim's cell revealed considerable quantities of blood and signs of a struggle near his bed.

Defendant did not testify but called eleven inmate witnesses, including Zeitvogel, in support of a theory that the victim had attacked Zeitvogel and Zeitvogel had stabbed him in self-defense. The eleven witnesses admitted to a total of 55 prior felony convictions, including eleven homicides. The jury returned a verdict of guilty.

At the punishment stage of the trial the State introduced evidence of defendant's prior convictions for assault with intent to kill with malice (2 convictions), first degree robbery with a dangerous and deadly weap-

---

**3.** Sergeant Matthias testified he had earlier seen the victim's cellmate Houtchin, outside cell 36 and considered this unusual because "normally [Houchin] doesn't leave his cell until around noon ... every day."

on (2 convictions), escape (2 convictions), second degree burglary (3 convictions), stealing (2 convictions) and auto theft. In addition, the State presented evidence of defendant's present incarceration and a previous stabbing incident. Defendant presented no evidence. The jury returned their verdict fixing defendant's punishment at death, finding the three statutory aggravating circumstances, *supra*, and additional aggravating circumstances that defendant was convicted in 1973 and 1977 for the felony of assault with intent to kill with malice.

Considering all of the evidence, direct and circumstantial, together with all reasonable inferences therefrom, in support of the verdict, and casting aside all contrary evidence and inferences, the jury could reasonably find, beyond a reasonable doubt, that defendant and Zeitvogel murdered McBroom.[4]

■ Three of defendant's points relate to jury selection. He first avers that the "Witherspooning" [*Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968)] of the jury panel should have been conducted separately with each individual venireperson, or alternatively such examination be prohibited altogether, because the mere asking of the death-qualification questions tainted the minds of the potential jurors.

In *State v. Smith*, 649 S.W.2d 417 (Mo. banc 1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983), we said: "[T]he examination of jurors as to their qualifications is conducted under the supervision of the trial court and the nature and extent of the questions counsel may ask are discretionary with that court (citation omitted)." *Id.* at 428.

We find no basis for a finding of an abuse of discretion by the trial court not requiring separate and individual voir dire of the panel members. Here, the trial court permitted the division of the panel into two groups for voir dire examination.

This procedure was within the trial court's discretion. *See State v. Yowell*, 513 S.W.2d 397, 403 (Mo. banc 1974).

There is no *evidence* that death-qualification questioning creates bias in the minds of potential jurors and the studies relied upon by the defendant does not convince us otherwise. Similarly rejecting the contention that death-qualification questioning be conducted individually have been the courts of New Mexico [*State v. Hutchinson*, 99 N.M. 616, 661 P.2d 1315, 1319 (1983)], Maryland [*Poole v. State*, 295 Md. 167, 453 A.2d 1218, 1229 (1983)], Arkansas [*Heffernan v. State*, 278 Ark. 325, 645 S.W.2d 666, 667 (1983)], North Carolina [*State v. Brown*, 306 N.C. 151, 293 S.E.2d 569, 583, *cert. denied*, 459 U.S. 1080, 103 S.Ct. 503, 74 L.Ed.2d 642 (1982)], Indiana [*Fielden v. State*, 437 N.E.2d 986, 992 (Ind.1982)], and Louisiana [*State v. Lindsey*, 404 So.2d 466, 476–77 (La.1981)]. Furthermore, defendant's attempt to exclude all death-qualification questions has been rejected by the United States Supreme Court and by this Court. *Adams v. Texas*, 448 U.S. 38, 44–45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980); *Lockett v. Ohio*, 438 U.S. 586, 596, 98 S.Ct. 2954, 2960, 57 L.Ed.2d 973 (1978); *State v. Stokes*, 638 S.W.2d 715, 722 (Mo. banc 1982), *cert. denied*, —— U.S. ——, 103 S.Ct. 1263, 75 L.Ed.2d 488 (1983); *State v. Mercer*, 618 S.W.2d 1, 7–8 (Mo. banc), *cert. denied*, 454 U.S. 933, 102 S.Ct. 432, 70 L.Ed.2d 240 (1981).

■ Defendant next argues the *Witherspoon* doctrine is unconstitutional because the removal of persons who are unable to follow the instructions and law as to punishment leaves a panel which is "less than neutral with respect to guilt." This argument and the studies cited in support thereof have been rejected by the Supreme Court [*Witherspoon v. Illinois*, 391 U.S. at 516–518, 88 S.Ct. at 1774–1775; *Bumper v. North Carolina*, 391 U.S. 543, 545, 88 S.Ct. 1788, 1790, 20 L.Ed.2d 797 (1968)]; and by

4. Zeitvogel's challenge to the sufficiency of the evidence was reviewed and rejected by the Western District. 655 S.W.2d at 692–693. The evidence in *Zeitvogel* closely paralleled the evidence in this case.

this Court [*State v. Mercer, supra* ]; *State v. Mitchell,* 611 S.W.2d 223, 229 (Mo. banc 1981)]. The same contention has been rejected by a host of other jurisdictions.[5] Because venireman Kopman stated he would be unable to impose the death penalty regardless of the evidence, he was properly stricken for cause under *Witherspoon. State v. Battle,* 661 S.W.2d 487 (Mo. banc 1983) (1983). Contrary to defendant's assertion, venirepersons Winter and Laune were not stricken for cause after both had expressed some reservations about their ability to impose the death penalty. The record shows they were not included on the final panel because a sufficient number of qualified persons had already been found.

▪ Defendant's final attack on jury procedure is his contention that the trial court should have provided for separate juries to determine the issues of guilt and punishment. Defendant recognizes that Missouri procedure in capital murder trials calls for a two-stage process. Section 565.006, RSMo 1978. Again, defendant advances the arguments and studies that death-qualified jurors are more conviction prone and to avoid this result a different jury should assess punishment. Defendant cites no authority to support his contention that use of the same jury for both guilt and punishment is unconstitutional.

We first note Missouri law does not provide for a second jury, and, consequently, the trial court had no power to empanel a different jury to determine defendant's punishment. Further, the use of a single jury was inherent in the Georgia and Texas laws upheld by the Supreme Court in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); and *Jurek v.*

*Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). *See State v. Cherry,* 298 N.C. 86, 257 S.E.2d 551, 563 (1979), *cert. denied,* 446 U.S. 941, 100 S.Ct. 2165, 64 L.Ed.2d 796 (1980) (bifurcated system); *Collins v. State,* 261 Ark. 195, 548 S.W.2d 106, 120, *cert. denied,* 434 U.S. 878, 98 S.Ct. 231, 54 L.Ed.2d 158 (1977) (bifurcated system). We find no constitutional infirmity in Missouri's statutory scheme providing for a single jury to determine guilt and punishment in a bifurcated trial.

▪ Defendant avers he was prejudiced and denied his right to a fair and impartial trial because he and his ten inmate witnesses "were kept in leg chains, handcuffs and/or leg irons in open court at the request of the trial judge." For the reasons which follow, we find no merit in this point.

During the course of the voir dire of the jury panel the panel members were told the case involved the killing of a penitentiary inmate and that defense counsel had indicated 14 inmates would be called as defense witnesses. The trial judge informed the panel members it was his policy, for security reasons, that any time a prisoner in custody was a witness, the prisoner-witness would appear under some type of restraint—handcuffs, waist chain, leg irons or "whatever". He cautioned that "this in no way reflects or is intended to reflect upon their credibility as a witness or their character as an individual. And the fact that they might be in restraints should not be considered by you in any way in judging their testimony." The court made a similar statement to the second panel of venirepersons. Defendant made no objection to the trial court's remarks and the record is com-

---

5. *Smith v. Balkcom,* 660 F.2d 573, 575–579 (5th Cir.1981), *cert. denied,* 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982); *Chadderton v. State,* 54 Md.App. 86, 456 A.2d 1313, 1315–1316 (1983); *Hill v. State,* 278 Ark. 194, 644 S.W.2d 282, 284 (1983); *State v. Truesdale,* 278 S.C. 368, 296 S.E.2d 528, 532 (1982); *People v. Newsome,* 110 Ill.App.3d 1043, 66 Ill.Dec. 708, 710–711, 443 N.E.2d 634, 636–637 (1982); *Nettles v. State,* 409 So.2d 85, 86–88 (Fla.Dist.Ct.App.), *cert. denied,* 418 So.2d 1280 (Fla.1982); *Harrell v. State,* 249 Ga. 48, 288 S.E.2d 192, 195 (1982); *State v.*

*Pinch,* 306 N.C. 1, 292 S.E.2d 203, 213, *cert. denied,* 459 U.S. 1056, 103 S.Ct. 474, 74 L.Ed.2d 622 (1982); *Justus v. Commonwealth,* 222 Va. 667, 283 S.E.2d 905, 909–910 (1981), *cert. denied,* 455 U.S. 983, 102 S.Ct. 1491, 71 L.Ed.2d 693 (1982); *Commonwealth v. Story,* 497 Pa. 273, 440 A.2d 488, 495–497 (1981).

We are not unmindful of *Grigsby v. Mabry,* 483 F.Supp. 1372 (E.D.Ark.), *modified,* 637 F.2d 525 (8th Cir.1980), 569 F.Supp. 1273 (E.D.Ark. 1983), and currently pending in the Eighth Circuit.

pletely silent as to whether any prisoners were in fact restrained when they appeared as witnesses. No objection was made during the course of the trial as to defendant's witnesses appearing in restraints. In *State v. Williams*, 623 S.W.2d 552 (Mo.1981), we said: "We cannot rule a point in favor of a defendant when the facts on which the point is premised are not shown in the record." *Id.* at 554.

■ Furthermore, the use of restraints for the purpose of maintaining order and security in the courtroom is a matter within the discretion of the trial court. *State v. Bolder*, 635 S.W.2d 673, 687 (Mo. banc 1982), *cert. denied*, — U.S. —, 103 S.Ct. 770, 74 L.Ed.2d 983 (1983). As was noted in *State v. Zeitvogel, supra*, the same contention was made as to the prisoner witnesses and the Court of Appeals noted that the trial court had ample facts from which to conclude security precautions were essential to prevent disruption and ensure the safety of all persons in the area. *Id.* at 687–689. The ten inmates that personally appeared and testified for the defendant had committed 47 felonies, including nine murders, eight assaults, five rapes or robberies, and most important for the trial court's consideration, five escapes. Eight of the ten inmates had been convicted of at least one murder and Zeitvogel had participated with defendant in the slaying of McBroom. Defendant alone had 12 prior felony convictions, including two escapes. Considering the criminal history of the inmate-witnesses, the fact they were presently incarcerated, and were friends and associates of the defendant, the trial court could properly determine what security measures would be carried out. *See State v. Cleveland*, 583 S.W.2d 263, 268–69 (Mo. App.1979) (the defendant in that case being one of the inmate witnesses for the defendant in the case before us) (conviction reversed on other grounds).[6]

Defendant alleges the admission of various photographs into evidence as part of the State's case was error because they were "gruesome, inflammatory and prejudicial."

■ The trial court has broad discretion in the admission of photographs and we find no abuse of that discretion in this case. *See State v. Weekley*, 621 S.W.2d 256, 260 (Mo.1981). The same photographs were admitted in *State v. Zeitvogel, supra*, and their admissibility upheld. The photographs were relevant to show the scene of the crime, the identity of the victim, the nature and extent of the stab wounds to the victim, the cause of death, and last but not least they served to refute the defendant's theory that the victim was the aggressor and stabbed by Zeitvogel in self-defense. "Insofar as the photographs tend to be shocking or gruesome it is because the crime is of that sort." *State v. Clemons*, 643 S.W.2d 803, 804 (Mo. banc 1983).

Defendant's remaining point concerns a letter written by William Houchin which was admitted into evidence. Houchin, cellmate of the victim at the time of the murder, was at time of trial imprisoned in the State of Tennessee and his deposition was taken by the defendant.[7] On cross-examination Houchin denied that he knew what Randy Cleveland and the other inmates were going to testify to at trial. The State introduced a letter written by Houchin to another Missouri inmate, Ray Milentz, which said:

I'm suppose [sic] to come back to testify for Frank G. and Rick, the lawyer said I would be brought back the 24th of this month. Tell Randy to have his shit together, I got mine.

■ We are of the opinion that the letter was properly admitted to demonstrate Houchin's bias as a witness by his attempt to coordinate his testimony with

**6.** Defendant was retried and found guilty. This latter conviction was affirmed on appeal. *See State v. Cleveland*, 627 S.W.2d 600 (Mo.1982).

**7.** Houchin had at least eight felony convictions. Kentucky convictions: breaking and entering

(2), armed robbery, murder, malicious cutting and wounding with intent to kill; Missouri—murder; Federal—interstate transportation of firearms; and armed robbery in Tennessee.

Cleveland, another defense witness and one whom the evidence indicated was peripherally involved in McBroom's slaying. The ready inference from the letter is that Houchin was wanting Cleveland to "get his story straight" about the killing as did Houchin, and demonstrates an inclination to lie in favor of defendant and Zeitvogel. A witness may properly be interrogated as to attempts to tamper with, or influence, other witnesses for purposes of impeachment for interest or bias. *State v. Mercer,* 611 S.W.2d 392, 396 (Mo.App.1981). We find no abuse of discretion in admitting the letter to demonstrate Houchin's interest and bias. *See State v. Glass,* 554 S.W.2d 426, 429 (Mo.App.1977).

 Pursuant to § 565.014.3, RSMo 1978, we are required to conduct an independent review of defendant's death sentence with regard to three factors. Defendant does not contend and we do not find the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor. The evidence supports the jury's finding of statutory aggravating circumstances enumerated in § 565.012. Lastly, the nature of the crime and the nature of the defendant support the jury's imposition of the death penalty in this case. As in *State v. Shaw,* 636 S.W.2d 667 (Mo. banc 1982), *cert. denied,* 459 U.S. 928, 103 S.Ct. 239, 74 L.Ed.2d 188 (1982), the evidence demonstrates a well-organized and cold-blooded scheme to commit a murder—with accompanying strategems to divert the attention of prison guards and create confusion. Defendant's statements immediately after the killing indicate that McBroom's murder was not the only murder contemplated that morning. The victim was stabbed a total of 16 times and remained conscious for a period of time before he collapsed from loss of blood. He had ample time to contemplate his fate.

Here, the killing was a deliberate and premeditated murder within a penal institution by a defendant already sentenced to imprisonment. Since defendant was not deterred by the 40-year sentence he was then serving, or by the sentences he had received for his 12 previous felonies, the jury could rightly conclude that no measure short of the death penalty was appropriate in this case. As we observed in *State v. Bolder,* 635 S.W.2d 673 (Mo. banc 1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 770, 74 L.Ed.2d 983 (1983):

> The life sentence that appellant is already serving for first degree murder did not deter appellant from committing still another murder. The imposition of yet another life sentence would serve no purpose other than to signal that there is no real cost for prisoners who kill while in confinement.

*Id.* at 690.

Defendant has been convicted of 12 prior felonies, including two robberies by means of a deadly weapon, two assaults with intent to kill and two escapes. His crimes have steadily increased in severity over the twenty-year period he has been committing felonies. The evidence shows that defendant has not hesitated to resort to violent means even while incarcerated, having been involved in prior stabbing incidents. He announced his intention to kill Camillo, attempted to kill Medley, and cut two prison officers while attempting to stab one of them. The evidence strongly suggests that defendant was the guiding force in the killing of McBroom. Defendant was 35 years of age with a record of 12 prior felonies. Zeitvogel was 24 years old—his relative youth was submitted as a mitigating factor in his case—and had five prior felonies. When the twosome went upstairs to McBroom's cell, defendant lead the way. As they left the cell it was defendant that attempted to conceal the murder by closing the cell door. It was defendant who confronted Camillo and threatened to kill him after proclaiming that "I killed your punk and I'll kill you too."

We have reviewed those cases in which the death penalty has been imposed. We do not find the sentence of death in this case to be excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

The judgment is affirmed.

All concur.