**STATE of Missouri, Respondent,**

v.

**Larry Gene GRAY, Appellant.**

**No. 15647.**

Missouri Court of Appeals,
Southern District,
Division One.

Nov. 28, 1988.

Jim Lynn, Columbia, for appellant.

William L. Webster, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Presiding Judge.

A jury found Larry Gene Gray ("defendant") guilty of the class B felony of promoting prostitution in the first degree, § 567.050, RSMo 1986, in that he promoted prostitution of C.B., a person less than sixteen years old. The jury assessed defendant's punishment at five years' imprisonment. Judgment was entered per the verdict. Defendant appeals, briefing two assignments of error. The first maintains the evidence "was not sufficiently substantial to support the conviction"; the second avers defendant was denied a fair trial when the jury venire observed him "being escorted to the jail in handcuffs and jail uniform."

In determining the sufficiency of the evidence to support the verdict we consider the evidence and all inferences reasonably to be drawn therefrom in the light most favorable to the verdict, and disregard all contrary evidence and inferences. *State v. Guinan*, 665 S.W.2d 325, 327 (Mo. banc 1984), *cert. denied*, 469 U.S. 873, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984); *State v. McDonald*, 661 S.W.2d 497, 500[1] (Mo. banc 1983), *cert. denied*, 471 U.S. 1009, 105 S.Ct. 1875, 85 L.Ed.2d 168 (1985). The test is whether the evidence, so viewed, was sufficient to make a submissible case from which rational jurors could have found beyond a reasonable doubt that defendant was guilty. *State v. Bonuchi*, 636 S.W.2d 338, 340 (Mo. banc 1982), *cert. denied*, 459 U.S. 1211, 103 S.Ct. 1206, 75 L.Ed.2d 446 (1983); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 2791–92, 61 L.Ed.2d 560, 576–77 (1979).

Delorse Morris testified she had known defendant about three years, that she had once had a "[b]oyfriend and girlfriend" relationship with him, and that he had fathered her one child. Ms. Morris disclosed that she worked as a prostitute for defendant at the 76 Truck Stop at Matthews, engaging in "sexual activities" with truck drivers for pay. According to Ms. Morris, defendant told her to teach C.B. how to do "the things that we did out there" and what the prices were.

Ms. Morris recounted that she went to the truck stop twice with C.B., the first occasion being Saturday, November 28, 1987, and the second occasion being Monday, November 30, 1987. Explaining their procedure Ms. Morris said, "We would get somebody on the radio, 'n, you know, we would be sent to different trucks." Asked how they contacted the truck drivers, Ms. Morris replied, "We have to make up a ... handle." Ms. Morris recalled her handle was "Brown Sugar" and C.B.'s handle was "Candy Girl." Ms. Morris narrated: "[W]e'd get on there and we'd say would anybody like to talk to Brown Sugar or Candy Girl. Okay. When one of the truck driver's [sic] holler back at us, say, yes, I'll talk to you; then we'll have 'em take it down to another channel. And we'd try to find out where they at, we'll tell 'em, you

know, hit their brake lights or trailer lights or somethin' like that so we'd know where they at. And, uh, you know, we'd come up to their truck."

Asked who took her and C.B. to the truck stop, Ms. Morris replied that defendant took them in another man's car. Ms. Morris testified she and C.B. received money for their services from the truck drivers. Ms. Morris confirmed that the "arrangement" was that both she and C.B. were to give their money to defendant. Asked what she did with her money, Ms. Morris answered, "I gave it to him." According to Ms. Morris, she saw C.B. give defendant "over a hundred, I think" on one occasion.

Ms. Morris explained she did not accompany C.B. to the truck stop the night of December 1, 1987, and that C.B. "got caught" that night. The next morning, said Ms. Morris, defendant confronted her at her residence, stating it was her fault that C.B. had been caught. An altercation ensued during which defendant slapped Ms. Morris across her face, struck her on her neck and knocked her to the floor. Ms. Morris reported the attack to the police and disclosed the prostitution operation.

C.B., called as a witness by the prosecutor, testified she had become sixteen years of age December 21, 1987, that she had known defendant about a year and a half, that they had been "boyfriend/girlfriend," and that she still had "some feelings" for him. C.B. admitted she had gone to the truck stop with Ms. Morris and worked there as a prostitute, that she (C.B.) had been paid for her "activity," that she had earned thirty dollars the first night (Saturday, November 28, 1987), and that she had earned "about a hundred and thirty-five" the second night (Monday, November 30, 1987). Asked what she did with her money, C.B. replied, "I spent it." C.B. denied giving defendant any of her earnings. She acknowledged, however, that on one occasion she let defendant "hold some of it for me." She insisted her decision to earn money as a prostitute was her choice and that defendant had nothing to do with it.

C.B. recounted she was picked up by police officers about 7:30 p.m., the third time she went to the truck stop. Asked what she earned that night, she replied, "Nuthin'." C.B. explained that the reason she was taken into custody was for questioning "about a woman that was missing was found killed," and that she was questioned until about 1:30 a.m. During the questioning C.B. stated she had gotten to the truck stop with Ms. Morris' friend, Ruth, that defendant was her (C.B's) boyfriend, that defendant did not ask her to engage in prostitution, and that he "doesn't even know I'm doing it."

After the interrogation C.B. was taken to a "Detention Home." The next morning she was taken back to the "station" for more questioning. There C.B. saw Ms. Morris and listened while Ms. Morris made her statement. C.B. was then questioned anew and wrote out a statement in her own handwriting. That statement contained these passages, among others: "[Defendant] was in need for money and he asked for my help and that was the only way to get money that we could see so I tried it. . . . I really didn't realize the big risk I was taking until I started doin' it. . . . He asked me a few times because he needed a car and other things, like somewhere to stay. . . . [M]oney was getting low again. Delorse check wasn't coming in two weeks. And he needed money then so he asked Delorse to show me and for her to get to the truck stop herself. . . . We went to the truck stop twice together. The first night I made $45.00, the second night probably $125.00, I'm not for sure. . . . Because I was giving it to [defendant] to buy a car and need things like that. . . . I did what I did to help [defendant] out and me 'cause I know as long as he had the money anything I wanted moreorless [sic] needed he would get it. . . . And that's the truth."

Under questioning by defendant's lawyer, C.B. testified she wrote the statement quoted from above because the police stated she was lying in the original statement taken the night she was picked up. She added she was afraid she would be locked up if she did not make a statement that defendant was her pimp.

The prosecutor called as witnesses a deputy sheriff of New Madrid County and a corporal of the Missouri State Highway Patrol. The deputy sheriff testified he was present during both occasions when C.B. was questioned, and that no one told her she would get in trouble if she did not say defendant was her pimp. The deputy added that a female juvenile officer was present when C.B. was questioned the night she was picked up. The juvenile officer thereafter took C.B. to the juvenile detention center.

The corporal testified he, along with the juvenile officer, was present during the questioning of C.B. the morning after she was picked up. The corporal denied anyone threatened C.B. in order to obtain her handwritten statement.

Defendant's attack on the sufficiency of the evidence has two components. The first—component "A"—maintains Ms. Morris' testimony "indicated an apparent bias against [defendant] because [he] had become intimately involved with [C.B.] and Morris' testimony was contradicted by State's witness [C.B.] who testified that [defendant] was not aware that [she] was engaging in prostitution."

Defendant's assertion that Ms. Morris was apparently biased against him is based on (1) Ms. Morris' testimony that she had once been intimately involved with defendant and he had fathered her child, and (2) C.B.'s testimony that defendant thereafter became involved with her and that Ms. Morris was "highly upset" when Ms. Morris first learned of defendant's overtures toward C.B.

Defendant's contention that Ms. Morris' testimony was contradicted by C.B. is based on the latter's testimony that defendant was not aware she was engaging in prostitution. Citing § 491.074, RSMo 1986, defendant cautions us that although C.B. "admitted to making a prior contrary statement, i.e., that she was induced to engage in prostitution activities by [defendant's] entreaties, that statement should not be considered as substantive evidence."[1]

In sum, says defendant, given the apparent bias of Ms. Morris and the fact that her testimony was contradicted by C.B., the evidence was insufficient to support his conviction.

We disagree. The only conflict between the testimony of Ms. Morris and the testimony of C.B. was whether defendant caused C.B. to engage in prostitution and received her earnings. C.B. freely admitted going to the truck stop with Ms. Morris on two occasions and engaging in prostitution each time. To that extent the testimony of C.B. was in harmony with the testimony of Ms. Morris. As to whether defendant caused C.B. to do so and received her earnings, Ms. Morris testified defendant told her to teach C.B. the routine for offering herself as a prostitute to truck drivers and what the prices were, that defendant took Ms. Morris and C.B. to the truck stop, and that C.B. gave defendant over a hundred dollars of her earnings on one of the two occasions. Ms. Morris' testimony that defendant blamed her when C.B. was caught is sufficient to support an inference that defendant knew C.B. was engaging in prostitution at the truck stop and that he was relying on Ms. Morris to aid C.B. in evading the authorities.

C.B's testimony that defendant was unaware she was engaging in prostitution and that he did not receive any of her earnings was thoroughly impeached by her handwritten statement the morning after she was picked up.

Conflicts in the evidence, the determination of the credibility of the witnesses and the weight to be given their testimony were within the province of the jury. *State v. Newberry,* 605 S.W.2d 117, 121 (Mo.1980). It is not our role to weigh the evidence, but rather it was the function of

---

1. Section 491.074, RSMo 1986, states: "Notwithstanding any other provisions of law to the contrary, a prior inconsistent statement of any witness testifying in the trial of an offense under chapter 565, 566 or 568, RSMo, shall be received as substantive evidence, and the party offering the prior inconsistent statement may argue the truth of such statement." The statute defendant was convicted of violating, § 567.050, RSMo 1986, is obviously not found in chapter 565, 566 or 568.

the jury to determine beyond a reasonable doubt whether defendant was guilty. *State v. Brown*, 660 S.W.2d 694, 698[9] (Mo. banc 1983).

Section 567.050, RSMo 1986, provides, in pertinent part:

"1. A person commits the crime of promoting prostitution in the first degree if he knowingly

. . . .

(2) Promotes prostitution of a person less than sixteen years old."

Section 567.010, RSMo 1986, provides, in pertinent part:

"As used in this chapter, the following terms mean:

(1) 'Promoting prostitution', a person promotes prostitution if, acting other than as a prostitute or a patron of a prostitute, he knowingly

(a) Causes or aids a person to commit or engage in prostitution; or

. . . .

(e) Accepts or receives ... something of value pursuant to an agreement or understanding with any person whereby he participates or is to participate in proceeds of prostitution activity; or

. . . ."

C.B.'s own testimony established she engaged in prostitution November 28 and 30, 1987, at the truck stop, and that she was less than sixteen years old on both occasions. Ms. Morris' testimony, if believed (as it evidently was), established that defendant told Ms. Morris to teach C.B. how to contact truck drivers and arrange assignations, that defendant told Ms. Morris to inform C.B. what prices to charge, that defendant took Ms. Morris and C.B. to the truck stop and that on one of the two dates C.B. engaged in prostitution she gave defendant over a hundred dollars of her earnings. Such evidence was sufficient to support a finding that defendant promoted prostitution of a person less than sixteen years old in violation of § 567.050.1(2), RSMo 1986. Component "A" of defendant's first point is denied.

■ Component "B" of defendant's first point arises from the fact that the information charged defendant with promoting prostitution of C.B. "on the 1st day of December 1987." Defendant maintains that inasmuch as C.B.'s uncontradicted testimony was that she did not engage in prostitution that date, and that "[t]he act of prostitution was a necessary element of promoting prostitution," the evidence was insufficient to support the verdict.[2]

■ Where time is not of the essence of the offense, the prosecution is not confined in its evidence to the precise date stated in the information, but may prove the offense to have been committed on any day prior to the date of the information and within the period of limitation.[3] *State v. Ellis*, 710 S.W.2d 378, 384–85 (Mo.App.1986); *State v. Mitts*, 608 S.W.2d 131, 133[4] (Mo.App. 1980); *Kansas City v. Wilhoit*, 237 S.W.2d 919, 926 (Mo.App.1951).

■ Defendant does not contend that time was of the essence of the offense, nor does he attempt to show he was prejudiced by the one-day and three-day variances between the date the information alleged the

---

**2.** Defendant also complains in component "B" that the verdict directing instruction hypothesized he caused C.B. to commit prostitution December 1, 1987. The transcript, however, contains no objection by defendant to the verdict directing instruction, and such instruction is not mentioned in defendant's motion for new trial. Rule 28.03, Missouri Rules of Criminal Procedure (19th ed. 1988), states: "A party may, but is not required to, object specifically or generally on the record ... to instructions ... to be given at the request of any other party, or to instructions ... which the court on its own initiative has given.... However, specific objections to given ... instructions ... shall be required in motions for new trial unless made on the record

at the time of trial...." By failing to object to the verdict directing instruction at trial and ignoring the instruction in his motion for new trial defendant has failed to preserve any complaint about such instruction for appellate review. *State v. Kirkland*, 684 S.W.2d 402, 404 (Mo.App.1984); *State v. Jackson*, 645 S.W.2d 725, 728[6] (Mo.App.1982).

**3.** The period of limitation for promoting prostitution in the first degree is three years. § 556.036.2(1), RSMo 1986. The information was filed December 22, 1987, thereby commencing prosecution that date. § 556.036.5, RSMo 1986.

offense was committed and the dates on which the evidence showed C.B. engaged in prostitution. Defendant says simply that the prosecutor, having charged him with promoting prostitution on December 1, 1987, was required to prove that defendant committed said offense on that date. Defendant cites two cases in support of his thesis, *State v. Carter*, 559 S.W.2d 572 (Mo.App.1977), and *State v. Achter*, 514 S.W.2d 825 (Mo.App.1974). Neither is apposite, as neither involved a variance between the date an offense was alleged to have been committed and the date the evidence showed it was committed.

In *State v. Payne*, 452 S.W.2d 805 (Mo. 1970), the information alleged the accused committed a robbery September 8, 1968. The evidence showed the robbery was committed September 7, 1968. The accused argued his conviction should be reversed because of the variance. Rejecting the argument, the Supreme Court of Missouri stated, "Time not being of the essence of the offense, this variance was not fatal." *Id.* at 809[12]. Such is equally true here. Component "B" of defendant's first point is denied.

The incident on which defendant bases his second point occurred the morning of trial prior to voir dire of the jury panel. The incident is described in this excerpt from the transcript:

"[Defendant's lawyer]: Your Honor, at this time I'd like to make a motion to quash this jury venire on the ground that the defendant was paraded in a jail uniform and handcuffs in front of the entire venire while they were in the courthouse hallway before the trial.

THE COURT: Let the record show that upon observing that the defendant had on clothing that is provided by the jail, the Court did ask the jailor to return the individual defendant to the jail so that civilian clothes could be put on. The defendant has now returned to court in civilian clothes. However, it is true that some members of the jury panel are milling around in the hallway outside of the courtroom, and that the defendant did enter the courtroom, so, it may be assumed that they did view the defendant in his jail clothing.

[Defendant's lawyer]: Your Honor, for the record I would like to state that this jail clothing is a very distinctive orange, one-piece jumpsuit.

THE COURT: The Court accepts that. However, the motion is denied."

Defendant's second point avers the trial court erred in denying defendant's motion to quash the jury panel in that defendant was denied his rights to due process and a fair trial, as the presumption of innocence was diminished by his appearance before the venire "in apparent custody."

The point was unmentioned in defendant's motion for new trial, and consequently has not been preserved for appellate review. *State v. Harris*, 620 S.W.2d 349, 354[7] (Mo. banc 1981); *State v. Peterson*, 518 S.W.2d 1, 3[2] (Mo.1974); Rule 29.11(d), Missouri Rules of Criminal Procedure (19th ed. 1988). Defendant, in his brief, acknowledges as much, but requests "plain error review" per Rule 30.20. The standard of review for plain error is that the plain error complained of must impact so substantially upon the rights of the accused that manifest injustice or a miscarriage of justice will result if the error is left uncorrected. *State v. Driscoll*, 711 S.W.2d 512, 515[1] (Mo. banc 1986), *cert. denied*, 479 U.S. 922, 107 S.Ct. 329, 93 L.Ed.2d 301 (1986).

In *State v. Bonnarens*, 724 S.W.2d 287 (Mo.App.1987), two television cameramen trained their cameras on the accused as he was brought through a tunnel from the jail to the courtroom prior to selection of the jury. Prospective jurors were in the hall outside the courtroom in a position to observe the incident. The accused moved to quash the jury panel. The motion was denied; the ruling was assigned as error on appeal. Framing the issue as what is the consequence of the exposure of an accused in custody to a jury panel, the appellate court rejected the assignment of error. The court stated that the applicable law followed by the overwhelming majority of jurisdictions is that where physical restraints are used on the accused in a hallway, corridor, or other location outside the

courtroom, but not in the courtroom, and where such restraints are used merely as a security measure in bringing the accused to or from the place of trial, rather than to restrict the accused's conduct while the trial is in progress, the use of such restraints is proper, or is not prejudicial, even if some jurors briefly observe the accused in such restraints outside the courtroom. *Id.* at 289. The court added it had long been the law in Missouri that a brief, inadvertent exposure to the jury of a handcuffed accused while he is being taken from one place to another does not deprive the accused of a fair trial. *Id. Accord: State v. Cowans,* 643 S.W.2d 628, 630–31[2] (Mo. App.1982); *State v. Berger,* 618 S.W.2d 215, 218 (Mo.App.1981).

*Estelle v. Williams,* 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976), relied on by defendant, is factually dissimilar. There the accused was compelled to wear identifiable prison clothing throughout his entire trial, despite his pretrial request to a jailor to be dressed in his civilian clothes. In the instant case the trial court took immediate steps when defendant was first brought to the courtroom to allow him to change from the orange jail jumpsuit to civilian clothing. That was apparently done, as the record contains no further complaint by defendant or his lawyer about either his clothing or the use of handcuffs or other restraints.

Furthermore, it must be noted that the Supreme Court of the United States held in *Estelle* that even though the accused was clad in prison clothing throughout his trial, his failure to make an objection to the trial court about the matter was "sufficient to negate the presence of compulsion necessary to establish a constitutional violation." 425 U.S. at 512–13, 96 S.Ct. at 1697[5]. In that respect *Estelle* is analogous to the instant case where defendant failed to preserve his second point in his motion for new trial.

Measured by *Bonnarens, Berger* and *Cowans,* the trial court, in denying defendant's motion to quash the jury venire, committed no plain error resulting in manifest injustice or a miscarriage of justice. De-

fendant's second point is denied and the judgment is affirmed.

HOLSTEIN, C.J., and GREENE, J., concur.