**STATE of Missouri,
Plaintiff-Respondent,**

v.

**William C. POOLE,
Defendant-Appellant.**

No. 13380.

Missouri Court of Appeals,
Southern District,
Division Two.

Dec. 28, 1984.

Donald R. Cooley, Springfield, for defendant-appellant.

John Ashcroft, Atty. Gen., Dan Crawford, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

HOGAN, Judge.

Defendant William C. Poole was convicted of manufacturing marijuana in violation of § 195.020.1, RSMo 1978, and his punishment was assessed at imprisonment for a term of 20 years.[1] Defendant appeals, his sole contention being that there was no substantial evidence to support a finding of guilt.

The case was tried to the court without the intervention of a jury. Rule 27.01(b) provides that the finding of the trial court in a criminal case shall have the force and effect of the verdict of a jury. Therefore in determining the sufficiency of the evidence to support the finding of guilt, this court must accept as true all evidence in the record tending to prove the defendant's guilt together with all inferences reasonably to be drawn therefrom and disregard all contrary evidence and inferences. *State v. Giffin,* 640 S.W.2d 128, 130[1, 2] (Mo.1982).

**1.** References to statutes and rules are to RSMo 1978, V.A.M.S. and V.A.M.R.

Cast in this light, the record shows that on September 15, 1982, federal, state and local officers discovered a sophisticated marijuana plantation on land known as the "Burney farm" 10 to 12 miles east of Marshfield in Webster County. Using a helicopter, the county sheriff flew close enough to the ground to be able to detect a 1½ acre planting of marijuana. Sheriff Fraker also caught sight of a man standing on the front porch of the farmhouse. The man was dressed in a white shirt and dark-colored trousers. The field of marijuana was discovered about 3 p.m.; about 3:30, the sheriff obtained a warrant to search the premises and returned to the Burney farm.

No one was found at the farm, although the farmhouse showed signs of recent occupancy; a television set was still operating in the farmhouse. There were several buildings on the farm. There was a dwelling house, a large barn about 60 feet east of the marijuana planting, a small "machine shed" and a hangar for an airplane. There was a well-worn footpath from the house to the barn and another from the barn to the marijuana plantation.

The plantation itself was enclosed by a barbed-wire fence. The growing area had been recently mulched. There was a pump in a nearby pond concealed by an overturned flat-bottomed boat. This pump drew water out of the pond and fed it into a thousand-gallon tank in the barn. Chemical fertilizer was added to the water in the tank, and the fertilizing solution was then drained into the growing field. Each plant was tagged; the tags bore identification numbers. Random samples were taken and the investigating officers then destroyed approximately 1,586 plants found in the plantation.

As proof of the defendant's criminal agency, the State had evidence that the defendant had purchased and owned a distinctively marked Jeep Honcho. A Jeep Honcho is a species of pickup truck. This particular vehicle had an "unusual paint job, gold trim, gold wheels." In late May or June, a Springfield police officer was

investigating an unrelated narcotics case in the area of the marijuana plantation. Using a "spotting scope," this officer observed the Jeep Honcho parked at the farmhouse near the place where the marijuana was planted. The officer described the vehicle he saw; it was undoubtedly the defendant's vehicle.

Much of the evidence tending to prove the defendant's participation in the crime came from two families named Clift who lived about ½ mile north or northwest of the Burney farm. The youngsters who testified are (apparently) the children of two brothers. Two of the Clift children—high school girls—were joggers; they often ran along a road near the Burney farm at night. One of these joggers, Cheryl Clift, saw the defendant's vehicle parked on the Burney farm at various times "[a]bout all summer." Cheryl's cousin June testified she saw the Jeep Honcho on the Burney farm about once a week. On one occasion, June and her sister were jogging by the Burney farm with their dog; another dog came from the Burney farm and the two dogs started fighting. The defendant, who had been mowing the lawn in front of the Burney farmhouse, appeared and separated the two dogs. At least once, June Clift had seen the defendant driving the Jeep Honcho in the neighborhood.

As indicated, the intrusion of the police helicopter about 3 or 3:30 p.m. on September 15, 1982, flushed one man from his place of concealment near the marijuana plantation. Sheriff Fraker spotted a man standing on the porch in front of the Burney farmhouse but was unable to identify him. The man was wearing a white T-shirt and dark trousers.

June Clift, whose residence was nearest the Burney farm, got off her school bus about 4 p.m. She saw a man in the field north of her house; he was alternately trotting and walking in a crouched position. June recognized this man as the person she had seen driving the Jeep Honcho, and as the man who had separated the two fighting dogs. The man walked away from the witness toward the other Clift residence, where he appeared shortly thereafter.

The defendant asked Tammy Humphrey—June's married cousin—for a place to hide and requested that she call her uncle Orville. Orville was called but did not respond. There was evidence that this man, identified on trial as the defendant, was wearing a white T-shirt and brown trousers. At the defendant's request, Mrs. Humphrey agreed to drive him to Springfield. Along the way, Mrs. Humphrey came upon Orville and a companion and the defendant decided to go on to Springfield with them. However, while the defendant was riding with Mrs. Humphrey, she heard him say: "There goes a half a million dollars down the drain" or words to that effect. Upon cross-examination, this witness was asked: "Would you repeat the statement that [the defendant] made while he was in your car [and] you were taking him ... toward Springfield?" She responded: "He said that there was money down the drain, [a] summer's work." Some time thereafter, the defendant was apprehended in Springfield and this prosecution followed.

Both counsel for the defendant and the Attorney-General invite comparison of the facts of this case to the facts of other cases involving the cultivation of marijuana. Admittedly such an approach permits one form of analysis but we decline to pursue it. A more convenient approach, which is at least as sound and as fair to the parties, is to consider the elements of the State's case and ascertain whether the proof is sufficient to establish those elements beyond a reasonable doubt.

Section 195.017.2(4)(j) lists marijuana as a controlled substance, i.e., a substance which has: (a) high potential for abuse, and (b) has no accepted medical use in treatment in the United States or lacks accepted safety for use in treatment under medical supervision. Section 195.017.1(1) and (2). Section 195.020.1 denounces the manufacture of any controlled substance. Section 195.010(21) defines "manufacture" to include the "production" of any controlled substance; "production" is defined by § 195.010(30) and "includes the manu-

facture, planting, cultivation, growing, or harvesting of ... a controlled substance ...." In *State v. Netzer*, 579 S.W.2d 170, 175–76 (Mo.App.1979), this court held that the offense of manufacturing marijuana consists of two elements: 1) causing the marijuana plants to have vegetal life and to encourage and promote their growth, with 2) an awareness of the character of the controlled substance. The second element may be established by reasonable inference. *Netzer*, 579 S.W.2d at 176[15]. If we take as a starting premise that in any criminal case the State must prove the corpus delicti and defendant's criminal agency, see e.g., *State v. Meidle*, 202 S.W.2d 79, 81 (Mo.1947), it becomes clear from what we have recited that commission of the "corpus delicti," i.e., the substantive offense, is clearly shown circumstantially; the defendant does not seriously contend otherwise. It is the defendant's criminal agency which is the issue on this appeal.

■ To reiterate, the State is entitled to the benefit of all the evidence tending to prove the defendant's guilt together with all reasonable inferences to be drawn therefrom. *State v. Giffin*, 640 S.W.2d at 130[1, 2]. The rule is no different because the evidence of defendant's agency is circumstantial. *State v. Cobb*, 444 S.W.2d 408, 412[3] (Mo. banc 1969). This modestly-meant opinion is no place for the development of theories of the quantum of proof necessary to sustain a conviction on circumstantial evidence, and one adage will do as well as another. One such aphorism is that the presence of the defendant at the scene of the crime and his flight may be considered as indicia of guilt and will support conviction when coupled with other circumstantial evidence showing active participation in the offense. *State v. Simmons*, 494 S.W.2d 302, 305 (Mo.1973); *State v. Harris*, 602 S.W.2d 840, 845 (Mo.App.1980).

■ The defendant's presence on the Burney farm was more or less continuous during the summer and early fall of 1982. Of course, the presence of defendant's gaudily-painted pickup does not require the inference that he drove it from his residence to the marijuana plantation frequently during the entire growing season but

such is a fair inference, one which the court as trier of fact was entitled to draw. Defendant's headlong flight from the Burney farm at the appearances of the police helicopter is also an evidentiary indication of his guilt. As far as the defendant's admission of guilt is concerned, his spontaneous statement that a summer's work had gone down the drain was at least as inculpatory as the species of admission made in *Graybeal v. State*, 13 Md.App. 557, 284 A.2d 37, 39 (1971), and others considered sufficient by courts adjudicating the sufficiency of the evidence to sustain conviction under statutes similar to ours. The judgment of conviction is affirmed.

MAUS, P.J., and PREWITT, J., concur.