**STATE of Missouri, Respondent,**

v.

**Claude H. WHITE, Appellant.**

**No. 13841.**

Missouri Court of Appeals,
Southern District,
Division Three.

April 29, 1985.

Motion for Rehearing or Transfer Denied
May 20, 1985.

Application to Transfer Denied
June 25, 1985.

Guy H. Richardson, Poplar Bluff, for appellant.

William L. Webster, Atty. Gen., Mary Elise Burnett, T. Chad Farris, Asst. Attys. Gen., Jefferson City, for respondent.

CROW, Presiding Judge.

Claude H. White ("defendant"), tried as a prior offender, § 558.016.2, Laws 1981, p. 636, was found guilty by a jury of manufacturing marihuana, proscribed by § 195.-020.1, Laws 1982, p. 384, and sentenced by the trial judge to 10 years' imprisonment. Defendant appeals; his sole assignment of error is that the evidence was insufficient to support the verdict.

In ruling that issue, we view the evidence in the light most favorable to the verdict, giving the State the benefit of all reasonable inferences to be drawn from the evidence, and we ignore contrary evidence and inferences. *State v. Guinan,* 665 S.W.2d 325, 327 (Mo. banc 1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984); *State v. McDonald,*

661 S.W.2d 497, 500[1] (Mo. banc 1983). The test is whether the evidence, so viewed, is such that a rational trier of fact could have found beyond a reasonable doubt that defendant was guilty. *State v. Bonuchi*, 636 S.W.2d 338, 340[1] (Mo. banc 1982), *cert. denied*, 459 U.S. 1211, 103 S.Ct. 1206, 75 L.Ed.2d 446 (1983); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 2791–92, 61 L.Ed.2d 560, 576–77 (1979).

Evidence supportive of the verdict showed that in January or February of 1983, Nick Pepmiller, Sheriff of Ripley County, stopped at a two-story frame house approximately 100 feet south of highway 142, some 9 miles east of Doniphan. The site is west and south of the nearby junction of highway 142 and Route N and, according to Pepmiller, 4 to 5 miles north of the southern boundary of Missouri.

Pepmiller saw defendant standing outside the door on the east side of the house. Asked if he knew whether defendant was residing there or just visiting, Pepmiller testified: "He said he was living there. He said he lived there."

Returning to the same house a few days later, Pepmiller knocked on the door, and defendant came out. While Pepmiller and defendant conversed, defendant's wife, Evelyn, also came out. Pepmiller saw no one else there on that occasion, and defendant mentioned no other residents. Asked whether there was evidence that defendant was residing there, Pepmiller testified: "Well, there were vehicles there and dogs and whatever were there. They had some dogs there."

On April 28, 1983, acting on information that marihuana might be growing near the house where he had seen defendant on the two occasions recounted above, Pepmiller went to an area approximately a quarter-mile from the house. There, said Pepmiller: "I saw several cultivated marijuana plants surrounded by wire, chicken wire, and paths leading from one to another. They were well cultivated plants." Pepmiller estimated the number of plants at 20 or 25.

Pepmiller thereupon notified Troop E of the Missouri State Highway Patrol and "started an investigation."

On June 12, 1983, Pepmiller, accompanied by Troopers Leon Tuschoff and Robert Stiffermann, returned to the site where he had seen the marihuana plants. This time, Pepmiller saw approximately 200 plants "scattered, with chicken wire around it, and dirt mounds up on the base of the stalks." Pepmiller recalled "three or four foot of cultivation around each plant and some places you could see little fertilizer still hadn't imbedded into the ground."

Trooper Tuschoff observed approximately 35 marihuana plants, similarly cultivated, south and east of the house "about at the back side of the property." Tuschoff saw defendant standing on a pond levee. Asked whether there were any marihuana plants near defendant, Tuschoff replied: "Yes. Just on the bottom side of the levy [sic] there was several plants approximately six or seven foot tall." Tuschoff estimated there were 15 or 20 marihuana plants within 50 feet of defendant. The pond, according to Pepmiller, was approximately one-eighth mile behind the house.

When Tuschoff saw defendant, Tuschoff, Stiffermann and Pepmiller decided to depart, to avoid being detected.

About mid-June, 1983, Sergeant Kenneth Howell of the Missouri State Highway Patrol, driving past the house on highway 142, saw defendant in the yard by an International pickup, tending a vegetable garden next to a small shed. On a later date, Howell drove past and saw defendant in the yard with some other people.

On July 7, 1983, Trooper Tuschoff drove past and saw defendant in the yard near the front of the house.

Sheriff Pepmiller recalled driving by in an unmarked vehicle three or four times, probably in early July. On some trips, Pepmiller saw defendant and a woman. On one occasion, defendant was sitting on the back of an International pickup in the yard. On another occasion, Pepmiller saw

two men, later identified as Paul White and Michael Hamilton.

On July 12, 1983, Sheriff Pepmiller and Trooper Tuschoff again visited the growing site, accompanied this time by Sergeant Howell. Asked whether he observed any changes since June 12, Pepmiller replied, "It had been well cultivated and well kept and the weeds were kept out of it, well cultivated, fertilized and had growed quite a bit."

Tuschoff counted over 200 plants on July 12, some as high as 15 feet. Each was cultivated in a 4-foot circle. Plants 4 feet high or shorter had chicken wire around them; the tall plants were tied to stakes.

Tuschoff's testimony included the following:

"Q. Was there any evidence of human occupation or activity on the premises besides the cultivation?

A. Yes there were several plastic gallon milk jugs, white in color around the various location from the pond to general gathering places where they had water in them. Also there were numerous paths. There was one well worn path, vehicle path leading from the patch itself to the barn and the house vicinity.

Q. Was there any foot prints of people or animals?

A. There were various foot paths throughout the whole patch of marijuana leading from the house throughout the patch and then back to the house which contained numerous dog foot prints of dogs and humans.

Q. Did you see any vehicle or tire tracks?

A. Yes I did. There was approximately ten inch wide, looked like some type of mud and snow grip tires, possibly on a four wheel drive vehicle that had been driving to a central location of the pond and back to the house.

Q. At any time did you ever see any vehicle actually on this property or did you see it on the road through the property?

A. On July 12th I seen a green and white International pick-up with out of state license sitting approximately sixty yards behind the house on a trail that lead to the marijuana field itself."

According to Tuschoff, he saw defendant standing near the pickup that day (July 12).

Around dawn on July 16, 1983, Sheriff Pepmiller, Sergeant Howell, Troopers Tuschoff and Stiffermann, and other officers went to the growing site, parking their vehicles in a wooded area to the south.

Tuschoff concealed himself in "a group of scrub oak trees" where the "vehicle trail and foot trails all came together" and led to the house. Tuschoff's position was 200 to 300 yards behind the house. Marihuana plants in that vicinity averaged 4 to 5 feet in height.

Pepmiller and another officer stationed themselves near the pond, approximately one-eighth mile from the house.

Howell took up surveillance nearest the house, in an area of 25 to 30 marihuana plants. About 6:45 a.m., he saw defendant come outside. Defendant went to a pen and released some dogs. Defendant and the dogs then started toward the wooded area where Howell was posted. Howell saw defendant walk over to one or two marihuana plants and look at them.

Defendant and the dogs came into Tuschoff's view around 7:00 a.m. According to Tuschoff, defendant would stop near a marihuana plant, examine it, then walk to another plant and stop again. There were "scrub oaks, prairie grass and other wild vegetation" in the area, but defendant stopped only at the marihuana plants. Describing defendant's actions, Tuschoff explained that defendant "did it in a way of a gardener would examine his roses or flowers or anything else."

Tuschoff intended to observe defendant as long as possible, but one of the dogs—a "redbone coon hound type"—detected Tuschoff and began barking. The other dogs, including a "big Doberman," then surrounded Tuschoff's position. Tuschoff thereupon stood up, identified himself as

an officer and arrested defendant, commanding defendant to "get the dogs off."

According to Howell, the arrest occurred about a quarter-mile from the house. Defendant was removed from the point of arrest to the southeast corner of the property and held there while the surveillance continued.

Sheriff Pepmiller and another officer took a new position some 60 to 70 feet from a marihuana patch. About noon, Paul White and Michael Hamilton walked by, looking at the marihuana "like they were inspecting it." They then walked on, disappearing from view.

About 15 minutes later, the duo came out of a field "going back toward the house." At this point, Pepmiller arrested them. They were escorted to the house, where Pepmiller commanded the remaining occupants to come outside. Those occupants turned out to be defendant's wife, Evelyn, an 8-year-old boy identified as Paul White's son, and another woman, Vickie Hamilton. A "detective sweep" of the house produced no other occupants. The officers did, however, find three guns, a "thirty-thirty," a "twenty-two" and a pistol. They also discovered a "Dragon Pipe," described as "drug paraphernalia."

Later that afternoon, armed with a search warrant, the officers searched the house and grounds.

Trooper Tuschoff testified:

"In the upstairs, I call it the bedroom, on opening that door we found residue of peatmoss and soil all over the floor and some styrofoam cups up there. And the window faces the South and there is a little porch out from the window and looking out that window you could tell where somebody had been setting some type of plants out on the roof for sun. There was styrofoam cups still sitting there too. There was also a growlight in that room to use to grow some type of vegetation indoors."

About 55 feet south of the house, in a backyard garden next to some tomatoes, Tuschoff observed over 200 styrofoam cups that contained peat moss and dirt. Six of the cups had small marihuana plants growing in them. Additionally, said Tuschoff, "There was still indication of over 300 marijuana or cups that had been removed from that area due to the imprint still in the soil."

Sheriff Pepmiller observed a garden hose connected to a faucet at the house. The hose led from there to the "hot bed" where the marihuana plants were found.

Sergeant Howell testified that when he had seen defendant tending the garden in mid-June, defendant was within 6 or 8 feet of the spot where the marihuana plants were discovered in cups on July 16.

Several sacks of peat moss and fertilizer were found in a nearby shed.

On July 17, 1983, the day after the arrest and search, Sheriff Pepmiller, Sergeant Howell, Troopers Tuschoff and Stiffermann, and other officers returned to the premises to destroy the marihuana. Beginning at a point approximately 75 to 100 yards behind the house, and going south from there, the officers seized 348 marihuana plants, which weighed, in the aggregate, some 1,370 pounds. After clippings were taken from the plants for laboratory analysis, the plants were burned.

Defendant's wife, Evelyn, was the only defense witness. Her testimony, in substance, was that she and defendant lived in Nashville, Tennessee, and had never lived in Missouri. Mrs. White explained that one of their sons, Larry White, lived in the house on highway 142 with some friends and that she and defendant had visited there for 2 or 3 weeks in January or February, 1983. She testified that she and defendant had returned for another visit in the spring, and for a third visit in June or July. Mrs. White denied knowing that marihuana was being grown behind the house, insisting that defendant had never said anything to her about it. She added: "We don't fool with marijuana in no way. We are too old to start."

By statutory definition, "manufacture," as it pertains to the case under review here, includes "production." § 195.010(21),

Laws 1982, p. 383. By further statutory definition, "production," includes "the ... planting, cultivation, growing ... of a controlled substance...." § 195.010(30), Laws 1982, p. 384. Marihuana is a Schedule I controlled substance. § 195.017.-2(4)(j), RSMo 1978.

Defendant contends there was no evidence that he planted, cultivated or grew any of the marihuana plants or that he knew they were marihuana. Defendant correctly asserts that no one testified to having seen him plant seeds, turn soil, fertilize, irrigate, pull weeds, or place wire around any of the marihuana plants. Indeed, no witness ever saw defendant even touch one. There was likewise no testimony that defendant purchased the cups, peat moss or fertilizer, or that he handled any of those items.

■ The lack of such testimony, however, simply illustrates that this is a circumstantial evidence case. While the facts and circumstances upon which the State relies must be consistent with each other, consistent with guilt, inconsistent with any reasonable theory of innocence, and must exclude every reasonable hypothesis of innocence, they need not conclusively establish guilt or demonstrate the impossibility of innocence. *State v. Prier*, 634 S.W.2d 197, 199[1] (Mo. banc 1982).

There was compelling evidence, of course, that one or more persons had planted, cultivated and grown the marihuana. The styrofoam cups, starter plants, peat moss, fertilizer, hose, plastic jugs, circular cultivation patterns, weeding, fencing and staking make it evident that the 348 marihuana plants burned by the officers had not sprung from the earth at this growing site by happenstance. What we must decide is whether a rational trier of fact could have found, beyond a reasonable doubt, that defendant (a) manufactured the marihuana, and (b) knew what it was.

Pertinent to those issues, defendant, by his own admission in January or February, 1983, was living in the house immediately north of the growing site. Sheriff Pepmiller recalled seeing the dogs on his second visit to the premises that winter.

On June 12, 1983, the second occasion on which Pepmiller observed the growing marihuana, Trooper Tuschoff saw defendant standing on the pond levee south of the house, within 50 feet of a number of marihuana plants, some of which were 6 to 7 feet in height.

During the interval between June 12 and the date of arrest (July 16) Sergeant Howell saw defendant on the premises on two separate occasions. On one of those, defendant was tending a garden, and the International pickup was parked nearby. This garden was within a few feet of the "hot bed" where small marihuana plants were found growing in styrofoam cups on July 16.

Nine days before the arrest, defendant was observed in front of the house by Trooper Tuschoff. Additionally, Pepmiller, on a trip past the house in early July, saw defendant sitting on the back of the pickup.

On July 12, the date of Pepmiller's third inspection of the growing site, Trooper Tuschoff saw the pickup sitting about 60 yards south of the house on the trail leading to the marihuana field. Tire tracks were observed from the pond to the house. Tuschoff, at that time, saw defendant standing near the pickup.

■ On July 16, during the minutes that preceded his arrest, defendant was walking among the marihuana plants, apparently checking on their condition. Although there were other types of vegetation along his route, defendant stopped only at the marihuana plants. The jury could readily infer from this that defendant was able to distinguish the marihuana from the other vegetation. Knowledge that a plant is marihuana can be established by reasonable inference. *State v. Netzer*, 579 S.W.2d 170, 176[15] (Mo.App.1979).

When the dogs discovered Trooper Tuschoff and encircled him, Tuschoff ordered defendant to call off the dogs, which defendant was evidently successful in doing, as the arrest was effected without incident.

The jury could reasonably conclude from this that the dogs, which had first been seen on the premises by Pepmiller several months earlier, belonged to defendant and were trained to obey him.

The peat moss, soil, styrofoam cups, and "growlight" in the upstairs bedroom support an inference that marihuana plants had been started in cups there. It appeared that the plants had been set on the roof outside the south window for sun.

The 200 styrofoam cups containing peat moss and dirt in the "hot bed" next to the backyard garden, the presence of the hose connected to the water faucet, and the small marihuana plants in several of the cups support an inference that young plants were tended there until they were large enough for transplanting in the field.

The circular cultivation patterns around the mature plants, the protection of the smaller ones by chicken wire, the staking of the larger ones, and the traces of fertilizer make it evident that a sophisticated marihuana farm was being operated on the premises. The jury could reasonably infer from the presence of the trails and tire tracks that the pickup was used to carry plastic jugs containing water from the pond to the area of the mature plants. On three separate instances within a month's time preceding his arrest, defendant was seen on or near the pickup. Additionally, the Dragon Pipe was found in the house in which defendant had admitted he lived.

Four decisions by this District of the Court of Appeals have dealt with the sufficiency of the evidence to support a conviction of manufacturing marihuana: *Netzer*, 579 S.W.2d 170; *State v. Poole*, 683 S.W.2d 326 (Mo.App.1984); *State v. Light*, 686 S.W.2d 538 (Mo.App.S.D.1985); *State v. Franks*, 688 S.W.2d 787 (Mo.App.S.D.1985).

*Netzer* is of little aid in the instant case because in *Netzer* there was eyewitness testimony that the two defendants turned soil and planted marihuana seeds. *Light* is likewise unhelpful, as the accused in that case made verbal admissions including a statement that the marihuana was "mine—all mine." *Poole* and *Franks*, however, rest on circumstantial evidence, and each holds the evidence sufficient to support the conviction.

Without lengthening this opinion by summarizing the evidence in *Poole* or *Franks*, we find the evidence of guilt in the instant case comparable to that in each of those cases. Indeed, in *Franks*, as here, the accused shared with his wife a residence on the premises where the marihuana patch was found.

Mindful, as pointed out in *Poole*, 683 S.W.2d at 329, that the rule giving the State the benefit of all evidence tending to prove the accused's guilt together with all reasonable inferences to be drawn therefrom is no different because the evidence of the accused's agency is circumstantial, *State v. Cobb*, 444 S.W.2d 408, 412[3] (Mo. banc 1969), we hold the evidence sufficient to support the conviction in the instant case.

Defendant's assignment of error is, consequently, rejected, and the judgment is affirmed.

PREWITT, C.J., and TITUS, FLANIGAN and MAUS, JJ., concur.